**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Squaw Valley Development Company
_____

Serial Nos. 76511144 and 76511145
_____

Virginia R. Richard, Lana C. Marina, and Matthew A. Pater of Winston & Strawn LLP for Squaw Valley Development Company.

Michael Baird, Senior Examining Attorney, Law Office 116 (M. L. Hershkowitz, Managing Attorney).

**NOTICE OF CORRECTION**

**By the Board:**

On May 18, 2006, the Board mailed a final decision in connection with this appeal.

Page 52 of the decision incorrectly states that the request for reconsideration is granted to the extent that the refusal to register under Section 2(a) is affirmed for both applications in International Classes _24_ and 35, rather than in International Classes _25_ and 35. In view thereof, page 52 of the decision is hereby corrected to indicate that the request for reconsideration is granted to the extent

that the refusal to register under Section 2(a) is affirmed for both applications in International Classes 25 and 35.

A corrected copy of the Board's final decision is attached.

Applicant's time for filing an appeal or commencing a civil action regarding the Board's decision will run from the mailing date of this notice of correction.  See Trademark Rule 2.145(d)(1), 37 C.F.R. §2.145(d)(1).

-o0o-

THIS OPINION IS
CITABLE AS
PRECEDENT OF THE
TTAB

Mailed:
May 23, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

In re Squaw Valley Development Company

————

Serial Nos. 76511144 and 76511145

————

Virginia R. Richard, Lana C. Marina, and Matthew A. Pater
of Winston & Strawn LLP for Squaw Valley Development
Company.

Michael Baird, Senior Examining Attorney, Law Office 116
(M. L. Hershkowitz, Managing Attorney).

————

Before Seeherman,[1] Quinn and Zervas, Administrative
Trademark Judges.

Opinion by Zervas, Administrative Trademark Judge:


### _Request for Reconsideration_

#### _A. Background_

On October 25, 2005, the examining attorney, citing _In
re Ferrero S.p.A._, 24 USPQ2d 1061 (TTAB 1992), requested
reconsideration of the Board's September 26, 2005 decision

---

[1] Judge Seeherman has been substituted for Judge Chapman, who
participated in the Board's September 26, 2005 decision and who
has since retired from government service.

in connection with this appeal. Squaw Valley Development Company ("applicant") filed a response on November 14, 2005.

Our September 26, 2005 decision reversed the trademark examining attorney's refusal to register the marks SQUAW and SQUAW ONE[2] (both in standard character form) on the Principal Register, both for the following goods and services:

> "men's, women's and children's clothing and accessories, namely, jackets, sweatshirts, sweaters, shirts, pants, bathrobes, t-shirts, gloves, head bands, vests, hats" in International Class 25;

> "skis, ski poles, ski bindings, ski tuning kits comprised of waxes and adjustment tools, ski equipment, namely, power cords" in International Class 28; and

> "retail store services in the field of sporting goods and equipment, apparel for men, women and children, footwear, headgear and related goods and services" in International Class 35.

The examining attorney had refused registration of the marks which are the subject of both applications under Section 2(a) of the Trademark Act, 15 U.S.C. 1052(a), on the grounds that each mark "consists of or comprises matter

---

[2] Application Serial Nos. 76511144 for SQUAW and 76511145 for SQUAW ONE were both filed May 2, 2003. In both applications, applicant claims first use and first use in commerce in 1949 for the goods in International Class 25 and the services in International Class 35, and first use and first use in commerce in 1968 for the goods in International Class 28.

which may disparage American Indians or bring them into contempt or disrepute." Brief at p. 2.[3]

*The Applicant*

As stated in our September 26, 2005 decision, applicant maintains that it is the "world famous resort, the home of the 1960 Winter Olympic Games" located in California; owner of the www.squaw.com Internet domain name; and owner of the following registrations (which are of record herein):

> Registration No. 670261 for the mark SQUAW VALLEY for "women's, men's, girls', and boys' jackets, pants, and sweaters"; and

> Registration No. 1628589 for SQUAW VALLEY USA for, inter alia, "hotel, restaurant and lounge services; providing recreational facilities for and instructions in skiing, golf, tennis, swimming, operating a ski lift, aerobics and other forms of exercise; real estate management; and bus and transportation services."

Applicant also maintains that "the primary significance of Applicant's mark SQUAW, as used in connection with Applicant's goods and services, is a shorthand reference to Applicant's world famous resort, SQUAW VALLEY," and the primary significance of SQUAW ONE is the name of one of

---

[3] Because applicant filed appeal briefs in both the SQUAW and SQUAW ONE applications, unless otherwise indicated, citations to applicant's brief are to applicant's brief filed in the SQUAW application.

applicant's ski lifts.  Brief at p. 6; SQUAW ONE brief at p. 6.

*The Board's September 26, 2005 Decision*

The Board, in its September 26, 2005 decision, reversed the examining attorney's refusal to register each mark for each International Class of goods and services. The Board applied the two-part test set forth in *Harjo v. Pro-Football, Inc*., 50 USPQ2d 1705, 1740 - 1741 (TTAB 1999) ("*Harjo I*"), *rev'd on other grounds*, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003), *remanded,* 415 F.3d 44, 75 USPQ2d 1525 (D.C. Cir. 2005), and later followed in *Order Sons of Italy in America v. The Memphis Mafia, Inc*., 52 USPQ2d 1364 (TTAB 1999), to determine whether the marks which are the subject of this appeal are disparaging under Section 2(a):

> (1) what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

> (2) if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

The District Court in *Pro Football, Inc. v. Harjo*, 284 F. Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003) ("*Harjo II*"),

4

*remanded,* 415 F.3d 44, 75 USPQ2d 1525 (D.C. Cir. 2005) found "no error" in this test for disparagement.

Under the first part of the test, the Board found that the meaning of SQUAW and SQUAW ONE, when used in connection with applicant's International Class 28 skiing-related goods, is applicant's Squaw Valley ski resort, and, when used in connection with the International Class 25 goods and the International Class 35 services, is "not applicant or its ski resort, but rather … the dictionary definition of SQUAW, i.e., an American Indian woman or wife." Decision at pp. 19 - 20. In view of the Board's finding regarding the International Class 25 goods and International Class 35 services, the Board went on to consider whether this meaning may be disparaging to a substantial composite of Native Americans under the second part of the two-part *Harjo I* test. The Board found as follows:

> [T]here is no evidence in the record that a substantial composite of Native Americans find applicant's use of its marks on its identified goods and services disparaging. The statements attributed to Native Americans and Native American groups do not address applicant's mark as used on its goods and services. Further, the fact that several states have taken the drastic step of renaming geographic sites to names which do not include the term "squaw" does not compel the conclusion that applicant's marks as used on applicant's goods and services are disparaging to a substantial composite of Native Americans.

5

Both *Harjo I* and *Harjo II* require evidence that a substantial composite of the referenced group considers the use of the mark in connection with the relevant goods or services to be disparaging. *Harjo I* at 1747; and *Harjo II* at 1252 ("However, the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services .... The ultimate legal inquiry is not whether the term 'redskin(s)' is a pejorative term for Native Americans.")

The evidence submitted by the examining attorney does not establish whether a substantial composite of Native Americans finds applicant's use of SQUAW in its *marks* on applicant's identified *goods and services* to be disparaging. The ultimate legal inquiry here is not whether Native Americans find "squaw" a pejorative term for Native American women. Decision at pp. 29-30. (Emphasis in the original decision.)

Thus, the Board reversed the refusal to register SQUAW and SQUAW ONE under Section 2(a) in each of the three International Classes.

### B. Request for Reconsideration

The purpose of a request for reconsideration is to point out errors made by the Board in reaching its decision, based on the evidence of record and the prevailing authorities. It is not merely to allow either the applicant or the examining attorney to reargue the case. See TBMP §1219.01 (2d ed. rev. 2004), citing TBMP §§ 543 and 544.

In the request for reconsideration, the examining attorney maintains that the Board erred in arriving at its

6

September 26, 2005 decision. The examining attorney makes the following three points in the request:

1. With respect to the goods and services in International Classes 25 and 35, the examining attorney asserts that the Board misapplied the second part of the *Harjo I* test in requiring evidence that the goods and services be considered in finding the term is disparaging;

2. The examining attorney asserts that the Board incorrectly applied an inter partes standard of evidence to this ex parte appeal; and

3. With respect to the goods in International Class 28, the examining attorney asserts that the Board did not correctly analyze the evidence relating to the first part of the *Harjo I* test.

Because these arguments are directed to errors of law and are not entirely re-argument, we consider the substance of the request for reconsideration.

**1.  With respect to the goods and services in International Classes 25 and 35, the examining attorney asserts that the Board misapplied the second part of the *Harjo I* test in requiring evidence that the goods and services be considered in finding the term is disparaging.**

The examining attorney maintains that the Board "misapplied" the second prong of the *Harjo I* test in finding that the examining attorney had not established that a substantial composite of Native Americans find disparaging applicant's use of SQUAW in its marks on the identified International Class 25 goods and International Class 35 services. The examining attorney states:

7

Nowhere in the second part of the test are goods and services mentioned. The relationship of the meaning of the term to the goods and services and the context of the marketplace is only referred to in the first part of the test. Because, as the Board found, the matter at issue had no other meaning for the relevant goods and services than as a reference to Native American women and a substantial composite of the targeted group finds the term to be disparaging, the test for determining disparagement was met. The Board should have so decided. Instead, the Board appears to have required a three prong test, i.e., requiring that the examining attorney show that the term has no other meaning in the context of the goods and services and in the market place but that of a term that targets a particular group (part one of the *Harjo I* test); that the examining attorney prove that the targeted group finds the term disparaging (part two of the *Harjo I* test) and then, as a third requirement, that the examining attorney must establish that the targeted group finds the use on Applicant's specific goods and services to be disparaging. (Request for reconsideration at unnumbered p. 5.)

The examining attorney characterizes the Board's

decision as requiring evidence of "actual disparaging use"

and maintains that requiring "actual disparaging use" on

applicant's goods and services is "misplaced";[4] that "a

substantial composite of Native Americans believe the term

to [be] disparaging in any context"; that the "very

---

[4] We did not state in our opinion that there must be evidence of "actual disparaging use." We stated, "[b]oth *Harjo I* and *Harjo II* require evidence that a substantial composite of the reference group considers the use of the mark in connection with the relevant goods or services to be disparaging"; and that "there is no evidence in the record that a substantial composite of Native Americans finds applicant's use of its marks on its identified goods and services disparaging." Decision at pp. 29 - 30.

8

existence of the term is disparaging"; and that

disparagement "may be inferred … from evidence regarding

the acceptability of the language or imagery used."

Request for reconsideration at unnumbered pp. 10 – 12.

The examining attorney also argues that if examining

attorneys are required to show that the "targeted group"

finds the use on applicant's specific goods and services to

be disparaging, this requirement would eviscerate Section

2(a) as a basis for refusal of registration:

> Clearly, a decision that requires the examining
> attorney to prove that a substantial composite of
> the … targeted group is disparaged when a
> derogatory term is used on specific goods or
> services would mean that the examining operation
> would be unable to apply Section 2(a), a result
> that Congress could not have contemplated.  Given
> the resources of the Office, an examining
> attorney is highly unlikely to prove that a
> targeted group is offended by use of a mark on
> *particular* goods and services which may or may
> not be in use, or if in use, may not be in use
> for a substantial period of time or be in use in
> an area where the targeted group may reside.  As
> written, the decision of the Board would seem to
> indicate that if there is no proof that the
> targeted group knows about the use of the
> purported mark so as to be offended, any mark may
> be registered.  (Request for reconsideration at
> unmarked p. 7.  Emphasis in original.)

Applicant maintains that the examining attorney is

"wrong" in contending that the *Harjo I* test does not

require a showing that the marks at issue are disparaging

to a substantial composite of the referenced group if used

9

in connection with the goods and services set forth in the applications. As support, applicant cites various passages from the Board's decision in *Harjo I* and from the District Court's opinion in *Harjo II*, maintaining that the District Court "repeatedly faulted the Board for finding disparagement in the absence of evidence that a substantial composite of the referenced group found the mark disparaging *in connection with the identified goods and services*." Response to request for reconsideration at p. 3. (Emphasis in original.) Further, applicant characterizes the examining attorney's arguments as asking that the Board "adopt a 'new' test pursuant to which disparagement would be determined in a vacuum without reference to the goods or services involved or the perceptions of the referenced group with respect to those goods or services." *Id*. at p. 4.

It has been long established that in the context of a Section 2(a) ex parte refusal regarding scandalousness, consideration must be given to the identified goods or services. See *In re Riverbank Canning Co*., 95 F.2d 327, 37 USPQ 268, 269 (CCPA 1938) ("Of course, the word 'Madonna' is not per se scandalous. We do not understand that appellant contends that a mark must be scandalous per se to come within the prohibition of the statute. … It is

10

therefore obvious that, in determining whether a mark 'consists of or comprises … scandalous matter,' consideration ordinarily must be given to the goods upon which the mark is used."); and *In re McGinley*, 660 F.2d 481, 211 USPQ 668, 673 (CCPA 1981) ("In determining whether appellant's mark may be refused registration as scandalous, the mark must be considered in the context of the marketplace as applied to only the goods or services described in the application for registration.").

The Board, too, has stated that the relevant goods or services must be considered under Section 2(a). In *Harjo I*, the Board cited *In re Riverbank Canning Co.*, *supra*, and stated, "[a]s with most trademark issues, including scandalousness, the question of disparagement must be considered in relation to the goods or services identified by the mark in the context of the marketplace." *Harjo I*, 50 USPQ2d at 1738. *Harjo I* involved claims by several Native American plaintiffs that certain registrations of the Washington Redskins professional football team for, inter alia, marks containing or consisting of the term REDSKINS were scandalous and disparaging to Native Americans. The Board agreed with the plaintiffs that several of the marks were disparaging, stating that "petitioners have clearly established, by at least a

11

preponderance of the evidence, that, as of the dates the challenged registrations issued, the word 'redskin(s),' as it appears in respondent's marks in those registrations and as used in connection with the identified services, may disparage Native Americans, as perceived by a substantial composite of Native Americans."  *Id.* at 1743.

Thereafter, Pro-Football, Inc. – the defendant in the Board proceeding - commenced an action in the District Court for the District of Columbia, seeking review of the Board's decision.  The District Court in *Harjo II* concluded "that the TTAB correctly stated the test for disparagement and neither of the parties specifically dispute[d] this approach."  *Harjo II,* 68 USPQ2d at 1247-1248. Additionally, the District Court emphasized that, under the second part of the *Harjo I* test, the question of disparagement had to be considered in the context of the involved goods or services.  The District Court went on to state:

> To reach its conclusion that the trademarks may
> disparage Native Americans, the TTAB essentially
> determined that because the *word* "redskin(s)" may
> be viewed by Native Americans as derogatory when
> used as a reference for Native Americans, the
> trademarks are disparaging because they use that
> word.  The result of this analysis is that there
> is very little discussion of the use of the mark
> in connection with Pro-Football's product or
> services.  … [I]n this case the TTAB did very
> little analysis of *how* the use of the trademarks

in connection with Pro-Football's services disparages Native Americans. The Board was content with stating that because it found the name to be pejorative, the marks must be disparaging. *Id.* at 1254. (Emphasis in original).

In commenting on the evidence considered by the Board in connection with its evaluation of the second part of the *Harjo I* test, the Court made clear that the goods and services must be taken into account in making a determination of whether a mark is disparaging, noting, in connection with survey evidence, that "the survey is not directly dispositive of the legal question before the TTAB because it … did not test the participants' view of the term 'redskin(s)' in the context of Pro-Football's services …." *Harjo II*, 68 USPQ2d at 1249. Similarly, with respect to the historical evidence before the Board, the Court said that "the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services and during the relevant time frame. The ultimate legal inquiry is not whether the term 'redskin(s)' is a pejorative term for Native Americans." *Id*. at 1252.[5] The District Court also

---

[5] The Board quoted this statement in arriving at its September 26, 2005 decision. According to the examining attorney, "the Board utilized this quote to support its conclusion out of context and in an inapposite manner," because the Board omitted the wording "during the relevant time frame" in its quotation. The examining attorney argues:

commented generally on the factual findings made by the Board, stating, "[n]one of the findings of fact made by the TTAB tend to prove or disprove that the marks at issue 'may disparage' Native Americans, during the relevant time frame, especially when used in the context of Pro-Football's entertainment services." *Id*. at 1249.

It is clear from the foregoing that the second part of the test for disparagement requires consideration of whether the term would be considered disparaging as the term is used in connection with the identified goods or services. Hence, we reject the examining attorney's contention that the Board did not apply the proper test in our September 26, 2005 decision and/or has applied "a three prong test."

---

> The missing terminology … is especially important
> because the *Harjo* case involved a cancellation
> proceeding and the issue before the Board and the
> Court was whether there was substantial evidence to
> show that the mark in question had a meaning in
> relation to Pro-Football services that was disparaging
> to Native Americans as of 1967 and not at the time of
> the cancellation proceeding. Request for
> reconsideration at unnumbered p. 6.

This argument has no bearing on, and does not dictate a different result in, this appeal. Of course, the relevant time frame here is the present, since this proceeding is an ex parte appeal, not a cancellation proceeding, when the issue date of the registration would be the relevant time period.

**2. The examining attorney asserts that the Board should apply different standards of proof in ex parte and inter partes proceedings.**

As a second argument in favor of reconsideration, the examining attorney submits that there is a different standard of proof in an ex parte proceeding such as this one and an inter partes cancellation proceeding such as *Harjo I*. The examining attorney maintains that "[t]he Board has consistently found that, in order to support a refusal to register, the examining attorney need only make a prima facie case"; that "the evidentiary burden then shifts to Applicant to rebut the examining attorney's finding"; and that "[i]n this case, the examining attorney has … made a substantial prima facie case." Request for reconsideration at unnumbered pp. 8 – 9.

Applicant, in response, maintains that "[t]he Examining Attorney failed to offer any evidence whatsoever concerning the views of the referenced group with respect to use of the applied-for marks in connection with the goods and services identified in the Application." Response at p. 4.

Of course, the examining attorney has the burden of proving that a trademark falls within a prohibition of Section 2(a). *See In re Standard Elektrik Lorenz Aktiengesellschaft*, 371 F.2d 870, 152 USPQ 563, 566 (CCPA

15

1967).  See also *In re Wilcher Corp.*, 40 USPQ2d 1929, 1934 (TTAB 1996) (evidence of record established prima facie that the mark would be offensive under Section 2(a) to the conscience or moral feelings of a substantial composite of the general public).

Once the USPTO sets forth a prima facie case, the burden shifts to the applicant to come forward with evidence to rebut the prima facie case with "competent evidence."  *See In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1010 (Fed. Cir. 1987); *In re R. M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984); *In re Teledyne Indus., Inc.*, 696 F.2d 986, 217 USPQ 9, 11 (Fed. Cir. 1982).

The Federal Circuit, our primary reviewing court, has commented on the evidentiary burden of the examining attorney and the limited ability of the examining attorney to gather evidence in support of a refusal.  In *In re Budge Mfg., Inc.*, 857 F.2d 773, 8 USPQ2d 1259 (Fed. Cir. 1988), the Federal Circuit considered whether LOVEE LAMB is deceptive when used for "automobile seat covers."  The Federal Circuit stated:

> In *ex parte* prosecution, the burden is initially
> on the Patent and Trademark Office (PTO) to put
> forth sufficient evidence that the mark for which
> registration is sought meets the … criteria of
> unregistrability.  Mindful that the PTO has

16

limited facilities for acquiring evidence--it cannot, for example, be expected to conduct a survey of the marketplace or obtain consumer affidavits -- we conclude that the evidence of record here is sufficient to establish a *prima facie* case of deceptiveness. *Id*. at 1260-1261.

Similarly, in *In re Loew's Theatres, Inc*., 769 F.2d 764, 226 USPQ 865 (Fed. Cir. 1985), the Federal Circuit considered whether the use of "Durango" for tobacco was primarily geographically deceptively misdescriptive under Section 2(e)(2) [currently, Section 2(e)(3)]. The applicant argued that the USPTO failed to make a prima facie case that there was a goods/place association between tobacco and the geographic name "Durango" because the USPTO produced no evidence that the public would actually make the asserted association. The Federal Circuit disagreed that the USPTO, as part of its prima facie case, must establish an actual goods/place association, reasoning that the examining attorney "does not have means" to undertake the research, such as a marketing survey, necessary to prove that the public would actually make the goods/place association asserted. The Federal Circuit consequently required the USPTO only to establish "a reasonable predicate for its conclusion that the public would be *likely* to make the particular goods/place association on

17

which it relies," and not that the public would actually make the asserted association. *Id.* at 868.

Also, in *In re Pacer Technology*, 338 F.3d 1348, 67 USPQ2d 1629 (Fed. Cir. 2003), a case involving the configuration of a container cap for adhesives and bonding agents, the Federal Circuit found that to establish a prima facie case of no inherent distinctiveness (which rested on whether the public in the relevant market would view the applicant's cap as a source-identifier), the USPTO was not required to show that other caps were actually being advertised, sold or used in the relevant market, but that evidence of the existence of other design patents for container caps was sufficient. The Federal Circuit acknowledged that it was "mindful of the reality that the PTO is an agency of limited resources" and stated that "we look only for substantial evidence, or more than a scintilla of evidence, in support of the PTO's prima facie case." *Id*. at 1632. See also *In re The Boulevard Entertainment, Inc*., 334 F.3d 1336, 67 USPQ2d 1475, 1478 (Fed. Cir. 2003), where the Federal Circuit, in the context of an ex parte Section 2(a) case, stated that "although other evidence, such as consumer surveys, would no doubt be instructive," the USPTO's finding that a mark comprises or consists of scandalous matter pursuant to Section 2(a) "is

18

not legally insufficient because of the absence of such evidence."

In our September 26, 2005 decision, we found that "there is no evidence in the record that a substantial composite of Native Americans find applicant's use of its marks on its identified goods and services disparaging." Decision at p. 29. We did not consider whether the evidence that was of record was sufficient to satisfy the examining attorney's burden of showing that a substantial composite of Native Americans find applicant's use of SQUAW in its marks on applicant's identified goods and services to be disparaging under the standard of proof approved by the Federal Circuit in ex parte cases. In other words, even though there was no *direct* evidence that a substantial composite of Native Americans find applicant's use of SQUAW in its marks on the identified goods and services to be disparaging, we did not consider whether the examining attorney met the Office's burden under the second prong of the *Harjo I* test by extrapolating from the evidence of record that a substantial composite of Native Americans find applicant's use of SQUAW in its marks on the identified goods and services to be disparaging. Thus, we now reconsider – applying the appropriate standard of proof for an ex parte case - whether the evidence of record

19

submitted by the examining attorney is sufficient to establish prima facie that a substantial composite of Native Americans find applicant's use of its marks in connection with its goods and services disparaging and, if so, whether applicant has rebutted the examining attorney's prima facie case. Because the examining attorney's arguments regarding the standard of proof are only directed to the Board's conclusions regarding applicant's goods and services in International Classes 25 and 35, we reconsider our decision in this respect in connection with these classes of the application.

> *a. Did the examining attorney establish a prima facie case of disparagement with respect to applicant's International Class 25 and 35 goods and services?*

As stated above, our September 26, 2005 decision resolved the first prong of the *Harjo I* test regarding the meaning of SQUAW and SQUAW ONE in the Office's favor in connection with the International Class 25 goods and International Class 35 services, namely, that in these marks, SQUAW conveys the dictionary definition of SQUAW as an American Indian woman or wife. The Board arrived at its conclusion despite the higher evidentiary burden we placed on the Office when we rendered that decision. Because the examining attorney has met the Office's burden under the

higher evidentiary standard, the examining attorney has a priori met the Office's burden under the standard we have now articulated. We hence do not revisit our findings with respect to the first prong of the *Harjo I* test.

The evidence submitted by the examining attorney which is relevant to our consideration of the second prong of the *Harjo I* test, i.e., whether the meaning of SQUAW and SQUAW ONE is disparaging to a substantial composite of Native Americans, includes the following:[6]

1. Excerpted stories retrieved from the Nexis database with statements from American Indian groups and individual American Indians regarding the offensiveness of the term "squaw," e.g.:

> *Indian Country Today, January 28, 2004*
> The term [squaw] is degrading and racist," said Fort Mojave Chairperson Nora McDowell, among Arizona Indian leaders speaking on Indian Nations and Tribes Legislative Day. McDowell refused even to say the word in her address to the state legislature. "I'm not going to say it because it is offensive to us as Native American women," said McDowell, president of the Intertribal Council of Arizona. … "Damaging and offensive," is how [Hopi Indian Chairman Wayne Taylor, Jr.] described the word "squaw" … Rep. Jack Jackson Jr., D-Window Rock, described the bill he has presented, H.B. 2500, which prohibits places in Arizona from being named "Squaw" ….

---

[6] The examining attorney relied on this evidence in contending that the meaning of "squaw" is a Native American woman under the first part of the *Harjo I* test. As further discussed below, the examining attorney considers the evidence of record as establishing that Native Americans consider "squaw" disparaging in any context and thus the Office need not provide specific evidence that Native Americans consider "squaw" disparaging with respect to applicant's mark as used in connection with the applied-for goods and services.

*The San Diego Union-Tribune, May 2, 2003*
BYLINE:  Tim Giago; Giago, an Oglala Lakota
[Indian, writes] … [I]t doesn't matter what the
word "squaw" means.  It is how the word
transformed its meaning from the early settler
days.  Any white man married to or living with an
Indian woman was known as a "Squawman."  When
white men went looking for sex they went "squaw
hunting."  If any white person living in Phoenix
or any other part of the United States wants to
know if the word "squaw" is offensive to Indian
women there is one sure way to find out.  The
next time you see several Indian women gathered
together just walk up to them and call them
squaws.  If you get away without having one hair
on your head mussed up, you may consider yourself
fortunate.  It does not matter whether all of the
white people in Phoenix believe "Squaw Peak" is
an OK name.  If just one Indian woman finds it
offensive then that alone is reason enough to
change the name.

*The Lewiston Morning Tribune, February 11, 2003*
Four [of the] 93 Idaho place names with the word
"squaw" in their names were officially changed
last December by the U.S. Board of Geographic
Names … Proponents of the name change have tried
for the last two years to remove squaw, which
many Indians consider offensive, from the names
of geographic features around the state.  "It is
never appropriate to use the word 'squaw,' said
Julian Matthews, 44, a Nez Perce tribal member …
Squaw should be dropped from names for no other
reason than that it is offensive to Indian women,
he said ….

*The Houston Chronicle, November 5, 2001*
Most offensive to Indians is the use of the term
"squaw" in mascot or place names, Hook said.
Most modern American Indian groups now consider
"squaw" an obscene reference to a woman's body
part, Hook said.  "It has always been a term of
derision for Indian women," he said.  In the past
few years there has been a national movement
among Indian leaders to have "squaw" purged from
place names.  The National Congress of American

Indians asked the U.S. Board on Geographical Names to have that term forbidden in use for place names across the country.

*The Omaha World Herald, January 28, 2001*
That position [that the name "Squaw" is not offensive] ignores Indians' feelings about the word, said Leonard Bruguier, a Yankton Sioux [Indian] and the director of the Institute of American Indian Studies at the University of South Dakota in Vermillion.  As he grew up in Yankton, S.D., "the people I knew were seasonal workers, hard workers," Bruguier said.  "They'd get drunk and you'd hear this, and it has a very negative connotation."  Linguists dispute the origin of "squaw," although it clearly is offensive today, said Bruguier … Some of those urging the abolition of "squaw" link it to a Mohawk word for a woman's private parts, retired UCLA linguistics professor William Bright wrote last fall in [the journal] Names.

*The Los Angeles Times, August 26, 1998*
The word "squaw" is a highly offensive Algonquin word. … To use the word squaw today is not only a grave insult to Native American women, it is an insult to the dignity of every woman.  [Letter from HASHI-HANTA, American Indian Movement, Sells, Ariz.]

*The Saint Paul Pioneer Press, April 6, 1997*
The word "squaw," long the stuff of TV westerns and American vernacular, is offensive to some American Indians, and a national activist group is launching a campaign to remove it from more than 100 places throughout California - including the most famous of all: Squaw Valley.  These activists, leaders of the American Indian Movement, say the word is the white man's pejorative slang for "vagina," and they consider it among "the worst of the worst."  The group's crusade has met with success in Minnesota, where it persuaded the Legislature to pass a law decreeing that 19 place names containing the word squaw be changed ….

*The Washington Post, September 20, 1993*
[Senator Ben Nighthorse] Campbell said the word Redskins is one of four terms most offensive to Native Americans, the others being buck, squaw and savage. … Campbell, a member of the Northern Cheyenne tribe ….

2.   Excerpted stories retrieved from the Nexis database which report that Native Americans find the term "squaw" offensive, including:

*The Rocky Mountain News, June 1, 2004*
Army Spc. Lori Piestewa, a Hopi from Arizona, was the first U.S. servicewoman killed in the Iraq war. … An Arizona mountain, Squaw Peak - a name offensive to Indian people - was renamed in her honor ….

*The Tampa Tribune, May 19, 2004*
The word "squaw" is as offensive to Indians as the "n-word" is to blacks.  It is so offensive and repugnant that it's been banned from geographical names in Minnesota and Arizona, and a bill passed in Florida aims to ban it as well ….

*The Chicago Tribune, April 18, 2003*
In renaming Squaw Peak, Napolitano also sought to remove a name Indians find offensive ….

*The Los Angeles Times, April 13, 2003*
The mountain is known as Squaw Peak, a name that many American Indians find offensive and have been trying to change ….

*The Fresno Bee, June 30, 2003*
Squaw Leap, a name that has long grated on American Indians, has passed into Central California history - at least, as far as the U.S. Bureau of Land Management is concerned.  The agency this month renamed 6,700-acre Squaw Leap Management Area. … It is now the San Joachin River Gorge. … American Indians … for decades have considered the name an insult. … Land Management officials said the word "squaw" has come under increasing fire across the country.

The word … carries disparaging and vulgar meanings ….

3.   Portions of state statutes retrieved from www.lexis.com, www.stateline.com, and www.revisor.leg.state.mn.us.com showing legislation enacted in five states that rename geographic sites having the term "squaw" or ban the term "squaw" from place names in public places:

*South Dakota Codified Laws §1-19C-4 (2003)* Offensive place names in South Dakota by county are replaced as follows: … Squaw Lake[changed to] Serenity Lake … Squaw Flat [changed to] Hat Creek Flat … Squaw Creek [in Jones County changed to] Pitan Creek … Squaw Creek [in Lawrence County changed to] Cleopatra Creek … Squaw Hill [changed to] Six Mile Hill … Squaw Lake [in Marshall County changed to] Six Mile Lake … Squaw Creek [in Moody County changed to] Jack Moore Creek ….

*Montana Code Annotated §2-15-149 (2003)* Naming of sites and geographic features replacement of word "squaw" -- advisory group. (1) The coordinator of Indian Affairs shall appoint an advisory group [to develop] names to replace present site or geographic names that contain the word "squaw".  (2) Each agency of state government that owns or manages public land in the state shall identify any features or places under its jurisdiction that contain the word "squaw" and inform the advisory group . . . [and shall ensure that] whenever the agency updates a map or replaces a sign, interpretive marker, or any other marker because of wear or vandalism, the word "squaw" is removed and replaced with the name chosen by the advisory group.

*Oregon Revised Statutes §271.600 (2003)* 271.600 Prohibition on use of term "squaw." … (2) Except as required by federal law, a public body may not use the term "squaw" in the name of a public property.

*Maine Revised Statutes 1 M.R.S. §1101 (2003)* §1101.  Definitions

25

1. OFFENSIVE NAME. "Offensive name" means a name of a place that includes:
A. The designation "nigger" or "squaw" as a separate word or as part of a word; or
B. The designation "squa" as a separate word.

*Minnesota Session Laws Chapter 53-S.F. No. 574 (1995)*
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MINNESOTA:
Section 1. … On or before July 31, 1996, the commissioner of natural resources shall change each name of a geographic feature in the state that contains the word "squaw" to another name that does not contain this word. …  Signed by the governor April 18, 1995 ….

4.   A concurrent resolution passed by the Oklahoma legislature calling for the renaming of geographic place names in Oklahoma containing the term "squaw":

*Concurrent Resolution No. 94 (Oklahoma Legislature, May 2000)*
WHEREAS, the word "squaw" is offensive to Native Americans, and a national movement exists to remove this offensive word from all geographic names. …  NOW, THEREFORE, BE IT RESOLVED …. THAT the word "squaw" be removed from all geographic names used in Oklahoma.
*www2.Isb.state.ok.us*

Also in evidence is a concurrent resolution considered by the Idaho legislature which addresses the "goal of the eventual renaming of all geographical place names in the state to eliminate the use of the word 'squaw,'" stating "Native Americans and many citizens of the state find the term 'squaw' objectionable and offensive to Native Americans."  House Concurrent Resolution No. 42, 2d Sess. 2002), located by the examining attorney at *www3.state.id.us.*

5.   Two dictionary definitions and one encyclopedia entry for "squaw" submitted by the examining attorney with Office actions issued in the involved applications.[7]

---

[7] Applicant, with its responses to the examining attorney's first Office actions, submitted the following definition of "squaw"

*The American Heritage Dictionary of the English Language* (online version)
1. Offensive.  A Native American woman, especially a wife.
2. A woman or wife.

*Merriam-Webster Dictionary* (online version)
1. *often offensive*:  an American Indian woman
2. *usually disparaging*:  <u>WOMAN</u>, <u>WIFE</u>.

*Encyclopedia of North American Indians,* Houghton Mifflin (College Division) (online version)
The literal meaning of the word *squaw* is obscure, and its connotations have changed over time.  Its origins are found among the northeastern tribes.  In Massachusetts, *squd* referred to a younger woman.  In Narragansett, *sunksquaw* meant "queen" or "lady."  Despite these Algonquian-language origins, however, nonnatives applied the term to native women throughout North America.  Over time it took on derogatory connotations as travelers referred to native women as *squaw drudges* and often used the term in opposition to Indian princess.  Nonnatives often referred to women leaders as *squaw sachems* and nonnative men who married native women as *squaw men.*  By the twentieth century the word *squaw* had developed multiple derogatory associations that had no connection with the word's original meaning.

In light of this evidence, the examining attorney

argues as follows:

The manner in which the applicant uses its SQUAW mark on the identified goods and services does not alter the fact that American Indians are

---

taken from *Webster's Third New International Dictionary,* Merriam Webster, Inc. (1993): "1a:  an American Indian woman – compare SANNUP  b: FEMALE, WOMAN, WIFE – usu. used disparagingly." (Capitalization in the original.)  Definition 1a does not include a usage designation directly after the definition.  However, the other dictionary definitions and other evidence of record indicating the offensiveness of the term outweighs the lack of a usage designation directly after definition 1a.

referred to, identified or implicated in some recognizable manner by the term "SQUAW."  As in *Harjo*, where the term "Redskins" was found to refer to Native Americans <u>and to retain its meaning when considered in connection with the registrant's services</u>, … the term "SQUAW" refers to an identifiable group – American Indians – and retains its meaning when considered in connection with the applicant's goods and services.  Brief at p. 14.  (Emphasis in the original brief.)

Applicant has challenged the examining attorney's evidence, maintaining that the evidence relied on by the examining attorney comprises excerpts from newspaper stories regarding legislation in a few states and localities banning use of the term "squaw" in geographical place names; and that this "limited evidence" does not relate in any way to use of the term SQUAW in connection with applicant's "skiing-related goods and services identified in the Application."  Reply at p. 13. Specifically, applicant argues as follows:

> There are more than 1,000 geographical features in the United States in thirty-six (36) states which have "squaw" in their names. (*Stateline.org*, April 26, 2000).  Only seven (7) states have enacted legislation concerning use of the term "squaw" in geographical names.  This legislation, however, is limited to geographical feature names and does not apply to business names and in some instances names of towns or villages.  (<u>See</u> <u>e.g.</u>, press release issued by the Oregon Legislature's Democratic Leadership Office, May 31, 2001, noting that the bill does not infringe on an individual's right to name his property whatever he wants; *The New York Times*, February 21, 2002, article which states that

28

Maine law requiring name change for geographical places containing the term "squaw" does not apply to businesses; *Stateline.org* April 26, 2000, article which states that Minnesota law applies only to geographic features, not to town names). The Examining Attorney provides no evidence that there is any consensus among the 2.4 million Native Americans regarding the meaning of the term "squaw". Reply at p. 5.

Additionally, applicant argues that "[t]he Examining Attorney offers only personal opinions of groups with political agendas and the legislation created under pressure to those agendas to support [the] refusal." Reply at p. 13. Applicant states:

The limited legislation referred to by the Examining Attorney appears to reflect the agenda of two activist groups, the American Indian Movement and the National Congress of American Indians. The majority of quotes cited by the Examining Attorney in support of her position that the term "squaw" is disparaging comes from either members of these political groups or legislators who have adopted the positions espoused by these groups. In order to promote their agenda, these political groups have attempted to cast the term "squaw" in the worst possible light by claiming that it refers to female genitalia. This inflammatory definition has been rejected by linguists in the very articles relied upon [by] the Examining Attorney. Reply at pp. 5 – 6.

We find that the evidence made of record by the examining attorney is sufficient to establish prima facie that applicant's marks disparage a substantial composite of Native Americans when used in the context of applicant's goods and services. The record includes statements from

29

Native Americans that the term is "damaging and offensive," "the worst of the worst," an "insult" and "obscene." The record also demonstrates that the opinions of Native Americans regarding the term are not limited to particular contexts. Certainly, as a term considered "damaging and offensive," "the worst of the worst," an "insult" and "obscene," the term "squaw" is encompassed within the definition of "disparage." (See definition of "disparage" in *Webster's Third New International* Dictionary (unabridged ed. 1993), of which we take judicial notice: "to speak slightingly of: run down: DEPRECIATE.")[8] Additionally, the record includes a statement from Senator Ben Campbell, a Native American United States Senator, that the term is "one of four terms most offensive to Native Americans." *The Washington Post, September 1993*. We add that even if, as applicant maintains, the statements in the record attributed to Native Americans are those of Native American activists and of legislators who share the views of such activists, we do not discount such statements. Applicant would have us assume that the views of Native American activists and sympathetic legislators do not represent the

---

[8] The Board may take judicial notice of dictionary definitions. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.*, 213 USPQ 594, 596 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

views of a substantial composite of Native Americans.
Applicant provides no basis for concluding that their views
would not be shared by a substantial composite of Native
Americans.  Further, in light of the ex parte nature of
this case and the Federal Circuit's recognition of the
limited resources of examining attorneys, we do not
discount the probative value of such evidence.

The record also shows that various states have taken
the drastic and symbolic step of renaming geographic places
containing the term "squaw" or banning the term "squaw"
from geographic place names within the state.  Of note is
*Maine Revised Statutes 1 M.R.S. §1101* (2003), which
characterizes "squaw" as "offensive," and includes the term
"nigger" in the same statutory section, deeming each as an
"offensive name."  Also, Concurrent Resolution No. 94 of
the Oklahoma Legislature (May 2000) describes the term
"squaw" as "offensive to Native Americans," without
limitation to a particular context.

Applicant's challenges to the legislative evidence on
the basis that there are only a limited number of statutes
that address "squaw" and that such statutes only address
geographical place names and not the names of towns or
villages, or the names of businesses, are not well taken.
Even if "there are more than 1,000 geographical features in

31

the United States" which have "squaw" in their names, and only seven out of thirty-six states have enacted legislation that applies to "geographical feature names" with "squaw," the fact that seven states have addressed the issue of names with "squaw" in them is significant. We cannot conclude from the absence of similar legislation to date in other states that those states consider the term to be inoffensive. Also, the statutory sections submitted by the examining attorney indicate that these seven states have enacted such statutes on the basis that the term is "offensive." As noted above, the Maine legislature has addressed the names of places containing "squaw" in the same statutory section as "nigger." See *Maine Revised Statutes 1 M.R.S. §1101* (2003). Additionally, that the legislation does not address the names of businesses and is not applicable to towns and villages does not detract from the fact that the term is viewed as offensive.

The record also contains evidence of Native American opposition to the term "squaw" as used in "Squaw Valley," which is the geographic location of applicant, part of applicant's trade name, and part of the trademark of applicant's claimed Registration Nos. 670261 (SQUAW VALLEY) and 1628589 (SQUAW VALLEY USA). See excerpted story from the April 6, 1997 edition of *The Saint Paul Pioneer Press*,

32

stating that "[t]he word 'squaw,' … is offensive to some American Indians, and a national activist group is launching a campaign to remove it from more than 100 places throughout California - including the most famous of all: Squaw Valley."

We conclude that the evidence offered by the examining attorney reflects that a substantial composite of Native Americans would consider the term SQUAW, when its meaning is a Native American woman or wife, to be disparaging *regardless of context*, including in connection with applicant's identified goods and services in International Classes 25 and 35. The evidence shows that this term, when it means a Native American woman or wife, is generally offensive to Native Americans, no matter what the goods or services with which the mark is used. Given the lesser evidentiary standard that is required of the USPTO in the ex parte context, it would be ludicrous to require an examining attorney to find statements from individuals in the relevant group stating that the term is offensive with respect to the specific goods and services in the application. Members of the affected group are not likely to make public statements regarding their feelings about the use of SQUAW with respect to specific goods or

33

services.[9]  Rather, we can infer from the evidence about the generally offensive nature of the term when meaning a Native American woman or wife that the term is offensive no matter with what goods or services it is used.

Thus, after reconsidering applicant's and the examining attorney's arguments, as well as the evidence before us, in light of the standard of proof required in an ex parte proceeding, we are persuaded that the examining attorney has met the Office's burden of establishing prima facie that a substantial composite of Native Americans finds the use of "squaw" in connection with applicant's identified goods and services in International Classes 25 and 35 to be disparaging.

Because we have found both that the meaning of "squaw," as used in applicant's marks for its goods and services in International Classes 25 and 35, is a Native American woman or wife, and that there is sufficient evidence of record for us to conclude that a substantial composite of Native Americans would find applicant's marks for such goods and services disparaging, we find that the

---

[9]  For example, it is unlikely that a tribal governing body would issue a statement that it found the use of SQUAW for "paperclips" to be offensive; there would be no reason that such pronouncements with respect to the use of the term for individual goods or services would be made.

34

examining attorney has made out a prima facie case of disparagement under Section 2(a).

> *b. Did applicant rebut the examining attorney's evidence that, under the second prong of the Harjo I test, the mark is disparaging as used in connection with the goods and services in International Classes 25 and 35?*

In view of our decision on reconsideration that the examining attorney has met the requirements of the second prong of the *Harjo I* test for disparagement, and therefore has established a prima facie case, we must consider whether applicant has rebutted the examining attorney's showing, and specifically whether applicant has rebutted the showing on the second prong of the test. In doing so, we have considered applicant's arguments in both its appeal brief and its response to the request for reconsideration.

> Applicant contended, in its brief on appeal, that:

> The mark SQUAW as used by Applicant for goods and services closely associated with its famous resort does not refer to identifiable persons. Therefore, it is not necessary to consider the second prong of the test for determining whether the matter is disparaging. Brief at p. 8.

We disagree. As stated above, the examining attorney has made out a prima facie case that applicant's marks are associated with identifiable persons, i.e., Native Americans, and, in our original decision we found in favor of the Office with respect to the first prong of the *Harjo*

35

*I* test. Applicant's unsupported statement that its marks do not refer to identifiable persons is not sufficient to rebut the evidence submitted by the examining attorney that the word SQUAW in applicant's marks, used in connection with the identified goods and services in International Classes 25 and 35, would have the meaning of a Native American woman or wife.

Applicant, in its reply brief, has again challenged the contention in the examining attorney's appeal brief that American Indians are "the relevant group of identifiable persons referred to, identified or implicated in some recognizable manner by the term 'SQUAW'…." Brief at p. 14. Although this argument uses a phrase from the second prong of the *Harjo I* test (identifiable persons), the argument actually goes to the first prong, i.e., what is the "likely meaning" of the mark as used in connection with the relevant goods and services since, if the mark does not have the "likely meaning" of a Native American woman or wife, Native Americans would not be the "identifiable persons" of the second prong. As we have noted, in our original opinion we found that the Office had met its burden of establishing that the meaning of SQUAW and SQUAW ONE for the goods and services identified in International Classes 25 and 35 was a Native American woman

36

or wife and, as we have stated in this decision, applicant has not rebutted this.

We note applicant's argument that its "mark is not used in connection with any other term or design element that would create an association with American Indians or any other identifiable person(s)," which was advanced by applicant to distinguish the present situation from those in other cases which had previously been cited by the examining attorney, namely, *Harjo I; In re Hines*, 31 USPQ2d 1685 (TTAB 1994), *vacated on other grounds*, 32 USPQ2d 1376 (TTAB 1994); *Doughboy Industries, Inc. v. The Reese Chemical Company, 88 USPQ 227 (Pat. Off. 1951);* and *In re Anti-Communist World Freedom Congress, Inc.*, 161 USPQ 304 (TTAB 1969). According to applicant, in these cases the marks at issue, which the Board found to be disparaging, "all included design or logo elements which reinforced the connection with the referenced persons or symbol the applied-for marks were found to disparage." In contrast, applicant submits that its marks "do not use any design or logo elements which alludes to Native Americans." Reply brief at p. 14. It appears to us that this argument, too, goes to the first prong of the *Harjo I* test, namely, the "likely meaning" of the term in the mark. We agree that applicant's marks do not contain any design or logo

37

elements, but are for word marks in standard character form. However, we are aware of no requirement in Section 2(a) or the case law interpreting Section 2(a) that to be found disparaging a mark must include design or logo elements which reinforce the connection with the referenced persons or symbol. In fact, in *In re Reemtsma Cigarettenfabriken G.m.b.H.*, 122 USPQ 339 (TTAB 1959), involving the mark SENUSSI for "cigarettes," the Board's decision does not refer to a design component in the applied-for mark, yet the Board found the mark to be disparaging to a Moslem sect whose tenets forbid the use of cigarettes.[10]

Applicant also maintains that the manner in which its mark is used does not create an association with American Indians, pointing to its specimens. Again, it appears to us that this argument goes to the "likely meaning" of the mark, the first prong of the *Harjo I* test, rather than to whether applicant has rebutted the examining attorney's

---

[10] Applicant discussed *Reemtsma* in its reply brief at p. 15, and argued that it is inapposite because "Applicant's mark SQUAW is not the name of a religious sect or order and this case is plainly not applicable to the present facts." We are not persuaded that the case is inapposite to the present case simply because "SQUAW is not the name of a religious sect or order." There are various ways in which terms can be used so as to disparage individuals or groups. Precedential case law is not inapposite merely because the nature of the disparagement in one case is different from another case.

showing that Native Americans would find the mark disparaging as used for the identified goods and services, which is the second element of the test. We agree with applicant's contention that "Applicant's mark is not used in connection with any other term or design element that would create an association with American Indians or any other identifiable person(s)."[11]

However, while use of Native American indicia in applicant's specimens would strengthen the association between the marks and the meaning of "squaw" as a Native American woman or wife, the lack of such indicia does not mean that there would be no such association. Even without other Native American indicia, consumers would understand applicant's marks for its identified International Class 25 and 35 goods and services to refer to a Native American woman or wife.

---

[11] Applicant's specimens for the goods in International Class 25 are a photograph of (i) a knitted headband with SQUAW written in large letters between two stylized snowflakes on the headband itself, and (ii) a plain long-sleeved collarless shirt with SQUAW ONE written in large letters on the front of the shirt. As for the International Class 35 specimens, the specimen for the SQUAW application depicts a store sign with SQUAW superimposed on a circular background having a stylized "S" or a "double S," with one "S" adjacent to the other; and the specimen for the SQUAW ONE application depicts SQUAW ONE on a store sign over the front door of the store, with "accessories" also written on the sign.

39

With respect to the second prong of the *Harjo I* test, applicant, in its opposition to the request for reconsideration, has attacked the examining attorney's evidence. Specifically, applicant asserts, "the Examining Attorney has offered no evidence that a substantial composite of the referenced group believes applicant's use of that mark in connection with the identified goods and services is disparaging." Reply brief at p. 13.

Contrary to applicant's contention, the evidence of record is sufficient for us to find (a) what a substantial composite of Native Americans believes; and (b) that applicant's use of the marks in connection with the identified goods and services is disparaging. As already mentioned above, in this ex parte proceeding the amount of evidence needed for the Office to make a prima facie case does not necessarily rise to the level of what is required in an inter partes proceeding because of the Federal Circuit's recognition that the Office has limited resources. The numerous quotations from Native Americans in the excerpted portions of Nexis articles set forth herein, and the fact that several states have taken the drastic step of changing the names of geographic sites containing the word "squaw," is sufficient for us to conclude that the sentiments regarding this term are not

limited to a minor portion of the Native American population, but rather reflect the views of a substantial composite of Native Americans.[12]

Further, the evidence is sufficient for us to conclude that applicant's use of the marks in connection with the identified goods and services is disparaging. The evidence shows that "squaw" is a term that Native Americans consider to be an offensive reference to Native American women and this term maintains its offensive meaning in most contexts, including when used in connection with applicant's identified goods and services in International Classes 25 and 35.

Thus, applicant's arguments directed against the examining attorney's evidence are not well taken. Applicant has not submitted any evidence which suggests that Native Americans do not view "squaw" as a non-disparaging term for its Class 25 and 35 goods and services.

Accordingly, we conclude that applicant has *not* rebutted either prong of the *Harjo I* test, and therefore we find that applicant has not rebutted the examining

---

[12] A substantial composite is not necessarily a majority. See *In re Mavety Media Group Ltd*., 33 F.3d 1367, 31 USPQ2d 1923, 1925 (Fed. Cir. 1994), quoting from *McGinley*, 211 USPQ at 763.

attorney's prima facie case of disparagement under Section 2(a).

**3. With respect to the goods in Class 28, the examining attorney asserts that the Board did not correctly analyze the evidence relating to the first part of the *Harjo I* test.**

In our September 26, 2005 decision, the Board found that the meaning of SQUAW in applicant's marks, as used in connection with its identified skis and ski equipment in International Class 28, is applicant's Squaw Valley ski resort in California. The Board therefore held that the marks were not disparaging under the first part of the *Harjo I* test, i.e., the "likely meaning" of the matter in question was not a Native American woman or wife.

The examining attorney has argued in the request for reconsideration that the Board's finding as to the meaning of the marks with respect to the International Class 28 goods is erroneous; and that "[t]he Board based [its] finding on evidence of the fame of the resort for winter sports and use of the mark[s] on skis on which the word SQUAW was closely accompanied by the wording 'Squaw Valley USA.'" Request for reconsideration at unnumbered p. 12. It is the examining attorney's position that this finding was incorrect because applicant is not limited to using the marks in close approximation to the wording "Squaw Valley

42

USA" and because applicant's skis and goods related to skiing could be sold in a ski shop *not* associated with applicant, where the consumer would not necessarily perceive the meaning of the term as the resort. *Id*. at pp. 12 – 13.

Applicant, in response to the examining attorney's arguments for reconsideration, maintains at p. 5 that the examining attorney has no basis for the requested reconsideration "other than an unsupported assertion that Applicant has not sustained its burden of proving that consumers would perceive use of the applied-for marks on the Class 28 goods as referring to Applicant as opposed to the dictionary meaning of the term"; and that the examining attorney "has presented no new evidence, no manifest error of fact or manifest error of law" with respect to the determination regarding the goods in International Class 28.

In the appeal, applicant argued that "Applicant uses the mark SQUAW in connection with ski equipment, clothing and retail sporting goods store services as a shorthand reference to SQUAW VALLEY"; that the "specimens of use submitted with the application demonstrate that Applicant's mark is not used in connection with any other term or design element that would create an association with

43

American Indians or any other identifiable person(s)"; and that the evidence submitted by applicant shows (i) that applicant's marks have "secondary meaning" identifying applicant's "world famous resort, SQUAW VALLEY, the home of the 1960 Winter Olympic Games, and the skiing-related goods and services identified in the Application"; and (ii) that the meaning of SQUAW ONE is "the world famous SQUAW VALLEY resort and the world famous ski lift named SQUAW ONE at that resort." Brief at pp. 6 – 7; reply at pp. 3 and 12. Applicant submitted numerous articles from the Nexis database in which applicant is referred to as "Squaw" and one of applicant's chair lifts is referred to as "Squaw One." The following are excerpts from representative articles showing such use of the term "squaw":

> *Reno Gazette-Journal, November 2, 2004*
> "… Squaw job fair this Sunday
> Find a job working at Squaw Valley USA during the upcoming ski season at the fair …."

> *The Seattle Times, November 23, 2003*
> Squaw Valley: The most noticeable change at Squaw is the opening of Phase II of the new base village ….

> *St Louis Post-Dispatch, November 9, 2003*
> Squaw Valley will be opening phase II of its expanded base village. … For those chained to their laptops, Squaw now provides wireless Internet access from nearly anywhere on the mountain.

44

*The San Francisco Chronicle, October 26, 2003*
-- Squaw Valley:  Phase II of the Village at
Squaw Valley is finished.  "You can finally come
here and not see a construction zone," said
Squaw's Katja Dahl.

*The Miami Herald, October 12, 2003*
Squaw Valley boasts 33 lifts, including North
America's only Funitel and a huge cable car, that
access six peaks, 4,000 acres and 2,850 vertical
feet of terrain.  Take a twirl on Squaw's on-
mountain skating rink located at High Camp (8,200
feet).

*Rocky Mountain News (Denver, CO), March 27, 2003*
Pearson stays with friends in South Lake, a 3½-
hour drive from San Francisco, nearly every
weekend in the winter.  He snowboards at Heavenly
and other Tahoe resorts like Squaw and Kirkwood.

*The New York Times, February 23, 2003*
TAHOE PACKAGE – Seventy-one motels, hotels and
vacation-home resorts in the North Lake Tahoe
area have nightly rates from $79 a person Sunday
to Thursday, $99 weekends for the rest of ski
season.  This includes lift tickets at ski
resorts like Squaw and Alpine Meadows.  There is
a two-night minimum; holidays are excluded.

*Charlotte Observer, February 16, 2003*
The first thing to know about Squaw Valley USA,
the California ski resort five miles west of Lake
Tahoe, is that nearly 20 years ago a movie was
filmed here that has become a cult classic. …
Thing is, a lot of the people who came to Squaw
to make that movie never left.

A substantial number of the articles submitted by applicant

in which "Squaw" is mentioned also include the term "Squaw

Valley."  It is clear that "Squaw" per se as used in those

articles is a shorthand reference to "Squaw Valley."

45

Additionally, applicant has submitted two articles from United States newspapers in which the term "Squaw One" appears in reference to applicant's "Squaw One" ski lift.[13] The first article appeared in *The Washington Post* on November 7, 1999 and states in relevant part:

> Squaw, which spread out in front of our home's hillside deck, owns the reputation of old-school macho. Home of the 1960 Winter Olympics and known for its challenging slopes …. And an hour after hitting the Squaw One Express lift, and winding up on something steep and icy, I knew why.

The second article appeared in *Deseret News* (Salt Lake City) on January 20, 2002, stating in relevant part:

---

[13] Applicant submitted eleven articles in support of its contention that "the likely meaning of the mark SQUAW ONE … is that of the world famous SQUAW VALLEY resort and the world famous ski lift named SQUAW ONE at that resort." SQUAW ONE brief at p. 6. Two of these articles refer to "Squaw One Accessories," which is a clothing outlet and not applicant's ski lift. (One of applicant's specimens of use in the SQUAW ONE application is a photograph of a storefront with a sign having "Squaw One Accessories" written on the sign.) Also, another two of these articles appeared in foreign publications, i.e., *The Toronto Sun* and *The Toronto Star*. Because there is no evidence that *The Toronto Sun* or *The Toronto Star* were distributed in the United States or that the stories therein had any exposure to prospective consumers in the United States, these two articles have limited evidentiary value. See *In re Men's International Professional Tennis Council*, 1 USPQ2d 1917, 1918 (TTAB 1986). Additionally, five of the eleven articles are from wire service reports. Wire service articles generally have limited evidentiary value because we cannot determine whether or to what extent they have been broadcast or otherwise distributed so as to reach appreciable members of the relevant public. *In re Cell Therapeutics Inc*., 67 USPQ2d 1795, 1798 (TTAB 2003). However, one of the wire service articles appeared in *The Deseret News* (listed above), and we have given it weight at least insofar as this publication is concerned.

> Squaw One, then the world's largest double chairlift, was wiped out by an avalanche the first year it ran. And the second. And the third.

Applicant has also made the following of record: (a) printouts from its www.squaw.com website referring to SQUAW and SQUAW ONE in connection with "Applicant's world famous resort"; (b) search results for "squaw" on the Yahoo and Google Internet search engines "in which the majority of the results returned refer to Applicant's SQUAW VALLEY resort"; and (c) a printout from "the online *Encyclopedia Britannica* website in which a search for the term 'Squaw' retrieved the following listing for Applicant's SQUAW VALLEY resort":

> Squaw Valley
> World-famous winter sports area in Placer County, eastern California, U.S., just northwest of Lake Tahoe. The focus of a state recreation area, it was the site of the 1960 Winter Olympics ….

Applicant also references the specimens of use in both applications as showing use by applicant of SQUAW and SQUAW ONE. Reply at p. 4; SQUAW ONE reply at p. 4.

As we stated in our September 26, 2005 opinion, the record shows that SQUAW VALLEY is well known in connection with the sport of skiing. Squaw Valley was the site of the 1960 Winter Olympics; *Encyclopedia Britannica* has an entry for "Squaw Valley" and identifies Squaw Valley as "world-

famous"; Squaw Valley is mentioned in numerous newspaper articles in newspapers from all over the United States; and, according to the November 7, 1999 *Washington Post* article noted above, Squaw Valley is known for its challenging ski slopes.  Further, the articles from the Nexis database submitted by applicant indicate that "Squaw" is used as a shortened form of "Squaw Valley."  In view thereof, the examining attorney's contention that applicant is not "legally limited to using the mark in close approximation with the wording 'Squaw Valley USA,'" as appears on one of the specimens of use for applicant's International Class 28 goods, while true, is of no consequence – the wording "Squaw Valley USA" on skiing related goods is not necessary to create an association of SQUAW with applicant; rather, the term SQUAW, when used with skiing related goods, would be perceived as a reference to the Squaw Valley ski resort.

The examining attorney also points out that there are no trade channel limitations in the identifications of goods and that "consumer[s] seeing those goods being sold in a ski shop not associated with Applicant would not necessarily perceive the meaning as the resort."  Request for reconsideration at unnumbered p. 13.  However, in view of the evidence of record, and particularly because many of

48

the articles referring to "Squaw" are from locations in the United States distant from applicant's resort, we cannot accept the implication in the examining attorney's argument that an association with applicant would only be created if the skis and skiing-related goods were sold in stores associated with applicant.

The Board has, in analyzing refusals under Section 2(a), considered the meaning of a term as reflected by the goods on which the mark is used. In *In re In Over Our Heads, Inc.*, 16 USQP2d 1653 (TTAB 1990), the Board reversed a refusal to register the mark MOONIES (and design) for a doll which dropped its pants when a collapsible bulb was squeezed, thus exposing its buttocks. The examining attorney took the position that "the mark comprised scandalous matter which disparaged The Unification Church founded by the Reverend Sun Myung Moon." *Id*. at 1653. However, the Board found that the term MOONIES had more than one meaning, and that the meaning of MOONIES, when used on the subject goods – dolls - would most likely be perceived as indicating that the doll "moons," and would not be perceived as referencing members of The Unification Church.

Accordingly, we reiterate our finding that, when SQUAW is considered in connection with applicant's "skis, ski

49

poles, ski bindings, ski tuning kits comprised of waxes and adjustment tools, ski equipment, namely, power cords," i.e., items which are directly connected with skiing, it is the Squaw Valley ski resort meaning of SQUAW, rather than the meaning of a Native American woman or wife, that will come to the minds of consumers. The same meaning will attach to SQUAW ONE, used for such goods, not because applicant has established that SQUAW ONE is well known (in view of the limited evidence regarding SQUAW ONE), but because of the prominence of the term SQUAW in the mark.

Because applicant has rebutted the examining attorney's showing regarding the "likely meaning" of the marks for the International Class 28 goods, it is not necessary for us to consider whether applicant has rebutted the second part of the *Harjo I* test, and the refusal to register the marks in Class 28 must be reversed. The examining attorney's request for reconsideration of our decision regarding the International Class 28 goods is denied.

## *Publication of the Mark*

As a final point, we address applicant's contention that "[d]oubts on the issue of whether a mark is disparaging are resolved in favor of the applicant," citing to *In re Mavety Media Group Ltd.*, 33 F.3d 1367, 31 USPQ2d

1923, 1928 (Fed. Cir. 1994), and *In re In Over Our Heads, Inc.*, 16 USQP2d at 1654-55, and its contention that "[b]oth the Federal Circuit and Board have previously supported the practice of passing a mark for publication and allowing any person(s) that finds such mark scandalous or disparaging the opportunity to oppose registration." Response at pp. 5-6. While it is true that the Board has on previous occasions resolved doubt as to whether a term was disparaging or scandalous in favor of publication, the key point is that the Board has done so when there has been doubt. In this case, upon reconsidering our previous decision and the evidence of record in light of the degree of evidence required for the Office to meet its burden to make a prima facie showing, we have no doubt that under Section 2(a), as interpreted by the Board and the courts, the term is disparaging with respect to the identified goods in International Class 25 and the identified services in International Class 35.

Thus, the examining attorney's request for reconsideration is granted to the extent that the Section 2(a) refusal is affirmed for the application in International Classes 25 and 35.[14]

---

[14] In his request for reconsideration, the examining attorney included a footnote suggesting that applicant's marks might also

**DECISION:** The examining attorney's request for reconsideration is granted in part and denied in part. It is granted to the extent that the refusal to register under Section 2(a) is affirmed for both applications in International Classes 25 and 35, and it is denied to the extent that the refusal to register under Section 2(a) remains reversed for both applications in International Class 28.

---

be considered scandalous under Section 2(a), and indicated that the Board had the authority to remand the application so that the examining attorney could consider whether a refusal might be made on this ground, also. If an application comes before the Board on appeal, and it appears to the Board that there may be a ground for refusal that was not previously considered by the examining attorney, the Board may, pursuant to Trademark Rule 2.142(f), remand the application to the examining attorney to consider whether such a refusal should be made. However, the Board will exercise its power to sua sponte remand an application only prior to the issuance of a final decision and not, as here, when a decision has been issued and the Board is considering a request for reconsideration. Indeed, once a final decision issues, the Board no longer has the authority to order such a remand. See Trademark Rule 2.142(g) ("An application which has been considered and decided on appeal will not be reopened except for the entry of a disclaimer under §6 of the Act of 1946 or upon order of the Director, but a petition to the Director to reopen an application will be considered only upon a showing of sufficient cause for consideration of any matter not already adjudicated.").