# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 8, 2005          Decided July 15, 2005
                     Reissued September 13, 2005

No. 03-7162

PRO-FOOTBALL, INC.,
APPELLEE

v.

SUZAN S. HARJO, ET AL.,
APPELLANTS

---

Appeal from the United States District Court
(USDC) for the District of Columbia
(No. 99cv01385)

---

*Philip J. Mause* argued the cause for appellants. With him on the briefs was *Norm D. St. Landau*.

*Thomas C. Morrison* argued the cause for *amici curiae* National Congress of American Indians, et al. in support of appellants. With him on the brief was *Walter Echo-Hawk*.

*Adam L. Barea* and *Robert R. Vieth* were on the brief for *amicus curiae* InterFaith Conference of Metropolitan Washington in support of appellants.

*Robert L. Raskopf* argued the cause for appellee. With him

on the brief were *Marc E. Ackerman*, *Carolyn B. Lamm*, and *Francis A. Vasquez, Jr.*

Before: SENTELLE, RANDOLPH, and TATEL, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: In 1992, seven Native Americans petitioned the Trademark Trial and Appeal Board ("TTAB") to cancel the registrations of six trademarks used by the Washington Redskins football team. After the TTAB granted their petition, the team's owner, Pro-Football, Inc., brought suit seeking reversal of the TTAB's decision. The district court granted summary judgment to Pro-Football on two alternate grounds, holding that the TTAB should have found the Native Americans' petition barred by laches and that in any event the TTAB's cancellation decision was unsupported by substantial evidence. The Native Americans now appeal. Because we find that the district court applied the wrong standard in evaluating laches as to at least one of the Native Americans, we remand the record for the district court to revisit this issue.

## I.

The Lanham Trademark Act provides protection to trademark owners. *See generally* 15 U.S.C. §§ 1051-1127, 1141-1141n. To take advantage of many of its provisions, trademark owners must register their marks with the Patent and Trademark Office. Not all marks, however, can be registered. Under 15 U.S.C. § 1052, the PTO must deny registration to certain types of marks, including those which, in subsection (a)'s language, "may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."

Another section, 15 U.S.C. § 1064(3), provides that if a

mark is registered in violation of section 1052(a), "any person who believes that he is or will be damaged by the registration" may file a petition "[a]t any time" with the PTO to cancel the registration. This triggers a proceeding before the TTAB, *see* 15 U.S.C. § 1067, which takes evidence and determines whether to cancel the mark. Yet another provision, 15 U.S.C. § 1069, states that "[i]n all . . . proceedings equitable principles of laches, estoppel, and acquiescence, where applicable may be considered and applied."

This case concerns the registrations of six trademarks owned by Pro-Football, the corporate owner of the Washington Redskins football team, that include the word "Redskin." The first—"The Redskins" written in a stylized script—was registered in 1967, three more in 1974, another in 1978, and the sixth—the word "Redskinettes"—in 1990. Pro-Football uses all these marks in connection with goods and services related to its football team, including merchandise and entertainment services.

In 1992, seven Native Americans petitioned for cancellation of the registrations, claiming that the marks had disparaged Native Americans at the times of registration and had thus been registered in violation of section 1052(a). Pro-Football defended its marks, arguing among other things that laches barred the Native Americans' claim. Rejecting this argument, the TTAB found laches inapplicable due to the "broader interest—an interest beyond the personal interest being asserted by the present petitioners—in preventing a party from receiving the benefits of registration where a trial might show that respondent's marks hold a substantial segment of the population up to public ridicule." *Harjo v. Pro-Football Inc.*, 30 U.S.P.Q.2d 1828, 1831 (TTAB 1994).

On the merits, the parties presented the TTAB with a variety of evidence, including (1) dictionary entries for "redskin," some of which contained usage labels identifying the

term as offensive and others of which did not; (2) book and media excerpts from the late nineteenth century through the 1940s that used the term "redskin" and portrayed Native Americans in a pejorative manner; (3) a study that found derogatory use of the term in Western-genre films from before 1980; (4) petitioners' testimony about their views of the term; (5) results from a 1996 survey of the general population and Native Americans that asked whether various terms, including "redskin," were offensive; (6) newspaper articles and game program guides from the 1940s onward using Native American imagery in connection with Washington's football team; and (7) testimony and documents relating to Native American protests, including one in 1972, aimed specifically at the team. In a lengthy opinion, the TTAB concluded that a preponderance of the evidence showed the term "redskin" as used by Washington's football team had disparaged Native Americans from at least 1967 onward. *Harjo v. Pro-Football Inc.*, 50 U.S.P.Q.2d 1705 (TTAB 1999). The TTAB cancelled the registrations. Cancellation did not require Pro-Football to stop using the marks, but it did limit the team's ability to go after infringers under the Lanham Act.

Pursuant to 15 U.S.C. § 1071(b), Pro-Football filed suit in the U.S. District Court for the District of Columbia, seeking reinstatement of its registrations on the grounds that: (1) laches barred the Native Americans' petition; (2) the TTAB's finding of disparagement was unsupported by substantial evidence; and (3) section 1052(a) violates the First and Fifth Amendments to the U.S. Constitution both facially and as applied by the TTAB. Although in suits challenging TTAB decisions parties may introduce new evidence in the district court, *see Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 146 F.3d 983, 989-90 (D.C. Cir. 1998), in this case the only such evidence of note related to laches. After discovery, the parties cross-moved for summary judgment. Without reaching the constitutional issues, the district court granted summary judgment to Pro-Football on the

alternate grounds that laches barred the Native Americans' petition and that the TTAB's conclusion of disparagement was unsupported by substantial evidence. *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96 (D.D.C. 2003). This appeal followed.

## II.

An equitable doctrine, "[l]aches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985). This defense, which Pro-Football has the burden of proving, *see Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C. Cir. 1982), "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002) (internal quotation marks omitted). In this case, the Native Americans contend both that the statute bars the defense of laches and that even were laches an available defense, Pro-Football has failed to prove it.

The Native Americans' statutory argument runs as follows: because section 1064(3) permits petitions alleging wrongful registration under section 1052(a) to be filed "[a]t any time," laches is not a valid defense in cancellation proceedings. We disagree. The words "[a]t any time" demonstrate only that the act imposes no statute of limitations for bringing petitions. Those words have nothing to do with what equitable defenses may be available during cancellation proceedings. Indeed, under the Native Americans' logic, equitable defenses would never be available as long as cancellation petitions are brought within the specified statute of limitations—"[a]t any time" for petitions alleging wrongful registration under section 1052(a) or certain other grounds, *see* 15 U.S.C. § 1064(3)-(5), and "[w]ithin five years" of registration for petitions brought for all other reasons, *see id.* § 1064(1). This would make section 1069,

which explicitly permits consideration of laches and other equitable doctrines, meaningless as to cancellation petitions. For this reason, we disagree with the Third Circuit's suggestion that laches is not an available defense to cancellation petitions brought pursuant to section 1064(3), *see Marshak v. Treadwell*, 240 F.3d 184, 193-94 & n.4 (3d Cir. 2001). Instead, we join the Federal Circuit, *see Bridgestone/Firestone Research, Inc. v. Auto. Club de L'Ouest de la France*, 245 F.3d 1359, 1360-61 (Fed. Cir. 2001) (permitting the defense of laches to a cancellation petition brought under section 1064(3)), and our own district court, *see Pro-Football, Inc. v. Harjo*, 57 U.S.P.Q.2d 1140, 1145 (D.D.C. 2000), in concluding that the statute does not bar the equitable defense of laches in response to section 1064(3) cancellation petitions.

The Native Americans also offer several reasons why, in their view, the district court erred in its assessment of laches in this case. At this point, we need only consider one: their claim that the district court mistakenly started the clock for assessing laches in 1967—the time of the first mark's registration—for *all* seven Native Americans, even though one, Mateo Romero, was at that time only one year old.

We agree with the Native Americans that this approach runs counter to the well-established principle of equity that laches runs only from the time a party has reached his majority. The Supreme Court first embraced this principle in 1792, holding in a case dealing with conflicting 1761 land grants that "*laches* cannot . . . be imputed" as the "rights do not seem to have been abandoned; for in 1761, the children were infants, and were hardly of age, when this action was brought." *Gander's Lessee v. Burns*, 4 U.S. (4 Dall.) 122 (1792). The Court has since held to this principle. *See Hoyt v. Sprague*, 103 U.S. 613, 636-37 (1880) (evaluating laches "after [complainants] came of age"); *Wetzel v. Minn. Ry. Transfer Co.*, 169 U.S. 237, 240 (1898) (acknowledging "that the minors were not affected by laches

until they became of age"); *cf. Wagner v. Baird*, 48 U.S. (7 How.) 234, 242 (1849) (noting that equity makes allowances for "circumstances to account for [a party's] neglect, such as imprisonment, infancy, coverture, or by having been beyond seas"); 2 Joseph Story, *Commentaries on Equity Jurisprudence, as administered in England and America* 844 n.(b) (photo. reprint 1988) (Melville M. Bigelow, ed., 13th ed. 1886) (stating that "[i]t is not laches to wait until one is in a legal condition to sue"); William MacPherson, *A Treatise on the Law Relating to Infants* 338-39 (Philadelphia, John S. Littel 1843) (observing that "[i]t is a maxim of law that laches is not to be imputed to an infant, because he is not supposed to be cognizant of his rights, nor capable of enforcing them").

Pro-Football asserts that were we to apply this principle here, it "would logically mean that trademark owners could never have certainty, since a disparagement claim could be brought by an as yet unborn claimant for an unlimited time after a mark is registered." Appellee's Br. at 48. At the least, this assertion is overstated—only owners of those trademarks that may disparage a population that gains new members (as opposed to one that disparages, say, a single corporate entity, *see, e.g.*, *Greyhound Corp. v. Both Worlds Inc.*, 6 U.S.P.Q.2d 1635 (TTAB 1988)), would face such a prospect. But even if registrations of some marks would remain perpetually at risk, it is unclear why this fact authorizes—let alone requires—abandonment of equity's fundamental principle that laches attaches only to parties who have unjustifiably delayed in bringing suit. Pro-Football forgets that "laches is not, like limitation, a mere matter of time," *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) (internal quotation marks omitted), but rather turns on whether the party seeking relief "delayed inexcusably or unreasonably in filing suit" in a way that was "prejudicial" to the other party, *Rozen v. District of Columbia*, 702 F.2d 1202, 1203 (D.C. Cir. 1983) (per curiam). Why should equity give more favorable treatment to parties that harm

expanding numbers of people (in which case, under Pro-Football's theory, laches runs from the date of harm) than it gives to parties that harm only a few people (in which case laches runs from whenever those people are free of legal disabilities)? Why should equity elevate Pro-Football's perpetual security in the unlawful registration of a trademark over the interest of a Native American who challenged this registration without lack of diligence? Why should laches bar *all* Native Americans from challenging Pro-Football's "Redskins" trademark registrations because *some* Native Americans may have slept on their rights?

The fact that Pro-Football may never have security in its trademark registrations stems from Congress's decision not to set a statute of limitations and instead to authorize petitions for cancellation based on disparagement "[a]t any time." *See* 15 U.S.C. § 1064(3). Congress knew perfectly well how to set statutes of limitations—as noted earlier, it required that petitions for cancellations on many other grounds be brought "[w]ithin five years" of registration, *id.* § 1064(1)—but consciously declined to do so with respect to cancellation petitions based on disparagement. Indeed, Congress may well have denied companies the benefit of a statute of limitations for potentially disparaging trademarks for the very purpose of discouraging the use of such marks. *See id.* § 1065 (providing that marks "shall be incontestable" after five years "*[e]xcept* on a ground for which application to cancel may be filed at any time under paragraphs (3) and (5) of section 1064" (emphasis added)); *cf. In re Riverbank Canning Co.*, 95 F.2d 327, 329 (C.C.P.A. 1938) (noting that the "field is almost limitless from which to select words for use as trade-marks, and one who uses debatable marks does so at the peril that his mark may not be entitled to registration").

Here, Romero has brought his own claim, and there is no reason why the laches of others should be imputed to him. In

accordance with the context-specific approach required by equity, the district court should have measured both his delay and the resulting prejudice to Pro-Football based on the period between his attainment of majority and the filing of the 1992 cancellation petition.

For several reasons, we prefer not to undertake our own analysis of Romero's laches. The district court never addressed this issue, the parties have briefed it minimally at best, and, most significantly, we may owe deference to the district court's assessment of laches. *Compare Daingerfield Island Protective Soc'y v. Lujan*, 920 F.2d 32, 38 (D.C. Cir. 1990) (conducting abuse-of-discretion evaluation of laches in reviewing a district court's summary judgment ruling), *with CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165, 172 (D.C. Cir. 2003) (conducting de novo evaluation of laches in reviewing a district court's summary judgment ruling). Therefore, we shall remand the record for the district court to evaluate Romero's laches.

In assessing prejudice, the district court should address both trial and economic prejudice. As to trial prejudice, the court should consider the extent to which Romero's post-majority delay resulted in a "loss of evidence or witnesses supporting [Pro-Football's] position," *see Gull Airborne Instruments*, 694 F.2d at 844. As to economic prejudice, we express no view as to how such prejudice should be measured where, as here, what is at stake is not the trademark owner's right to use the marks but rather the owner's right to Lanham Act protections that turn on registration. We encourage the district court to take briefing on whether economic prejudice should be measured based on the owner's investment in the marks during the relevant years, on whether the owner would have taken a different course of action—e.g., abandoned the marks—had the petitioner acted more diligently in seeking cancellation, or on some other measure.

### III.

While retaining jurisdiction over the case, we remand the record to the district court for the purpose of evaluating whether laches bars Mateo Romero's claim.

*So ordered.*