THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
March 4, 2010

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

**Trademark Trial and Appeal Board**
_____

In re Lebanese Arak Corporation
_____

Serial No. 77072261
_____

Rafi Ourfalian and Benjamin Aydindzhyan of Ourfalian &
Ourfalian for Lebanese Arak Corporation

David S. Miller, Trademark Examining Attorney, Law Office
113 (Odette Bonnet, Managing Attorney)[1]
_____

Before Rogers, Acting Chief Administrative Trademark Judge,
and Seeherman, Quinn, Mermelstein and Wellington,
Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Lebanese Arak Corporation, a California corporation,

has appealed from the final refusal of the trademark

---

[1] Three different examining attorneys were involved in examining
the application. In the initial Office action, the examining
attorney did not make any substantive refusals, but required that
applicant submit a translation of the mark and explain whether it
had any significance. In the second Office action, the examining
attorney entered a translation of the mark by examiner's
amendment. The application was then assigned to a second
examining attorney, who made the refusal that is the subject of
this appeal. The application was assigned to Mr. Miller after
the final refusal issued on April 8, 2008.

examining attorney to register KHORAN in standard characters as a trademark for "alcoholic beverages, namely wines." The application was filed on December 27, 2006, and is based on use in commerce, with a claim of July 1, 2000 as the date of first use and first use in commerce. By examiner's amendment, the following translation statement was entered into the record: The English translation of the word KHORAN in the mark is ALTAR.

Registration has been refused pursuant to Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that applicant's mark is disparaging. In particular, it is the examining attorney's position that applicant's mark, KHORAN, is the phonetic equivalent of "Koran"; that the Koran[2] is the sacred text of Islam; that the Koran forbids consumption of alcoholic beverages, including wine; and therefore that the use of KHORAN for wine is disparaging to the beliefs of Muslims. Before considering the refusal in more detail, it is useful to review the structure and development of Section 2(a) of the Act, for it has influenced the development of the case law on marks implicating religious or ethnic sensibilities.

---

[2] The record shows that there are various spellings of "Koran." Unless specifically noted herein, we will use the spelling "Koran" in this opinion.

2

Section 2(a) contains three parts separated by semi-colons, but encompasses five grounds for possible refusal of registration. The first part prohibits registration of "immoral, deceptive, or scandalous matter." Deceptiveness, however, is a separate ground for refusal, involving a different test from that for determining whether a proposed mark is immoral or scandalous, two terms that are typically discussed as though basically synonymous. See In re McGinley, 660 F.2d 481, 211 USPQ 668 n.6 (CCPA 1981). The second part of Section 2(a) bars registration of a proposed mark that falsely suggests a non-existent connection, as well as registration of matter which "may disparage … persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute."[3] Again, this part involves two separate grounds for refusal - false suggestion of a connection and disparagement – and two distinct tests.

The structure of Section 2(a), with various refusals and, therefore, different tests, interwoven into its various parts, is the result of its legislative development. In the Trademark Act of 1905, Section 5(a) was a simple bar against registration of marks comprising

---

[3] The third part of Section 2(a) bars registration of a misleading geographical indication for wines or spirits.

"immoral or scandalous matter."  Section 5 of the Act of 1905 became Section 2 of The Trademark Act of 1946, and that act inserted deceptiveness into the existing provision, added a semi-colon, and appended what is currently the second part of Section 2(a).  The third part was added by still later amendment.

It is likely a result of the chronological development of Section 2(a) that the first reported case dealing with a mark involving religious sensibilities was decided under the "immoral or scandalous matter" provision, because the disparagement provision did not then exist.  See In re Riverbank Canning Company, 95 F.2d 327, 37 USPQ 268 (CCPA 1938) (MADONNA for wine held "scandalous").  Further, the existence of the Riverbank Canning decision influenced a later case before the Board.  See In re Sociedade Agricola E. Comerical Dos Vinhos Messias, S.A.R.L., 159 USPQ 275 (TTAB 1968) (MESSIAS held unregistrable for wine and brandy).  The Board specifically noted in that case that the examiner had made the Section 2(a) refusal relying on the Riverbank Canning case, which may explain the assertion of a scandalousness refusal rather than a disparagement refusal, and the Board, too, stated its reliance on the earlier CCPA case.

Notwithstanding that Riverbank Canning and various subsequent Board decisions involving religious sensibilities discussed scandalousness as the ground for refusal, likely because of the historical development of Section 2(a), all such decisions clearly contemplated the beliefs of particular groups of individuals as critical. See Riverbank Canning, 37 USPQ at 270: "The Virgin Mary stands as the highest example of the purity of womanhood, and the entire Christian world pays homage to her as such. Her representation in great paintings and sculpture arouses the religious sentiments of all Christians." See also, In re Reemtsma Cigarettenfabriken G.m.b.H., 122 USPQ 339 (TTAB 1959), in which the applicant sought to register SENUSSI for cigarettes. Because Senussi is the name of a Muslim sect and the tenets of this sect forbid the use of cigarettes, the Board affirmed the refusal of registration. The Board stated that "[t]he application of the name of any religious order or sect to a product whose use is forbidden to the followers or adherents of such sect or order is an affront to such persons and tends to disparage their beliefs." Accord, In re Waughtel, 138 USPQ 594 (TTAB 1963), which reversed a refusal to register AMISH (and the design of a man in Amish clothing) for cigars because "the use of the mark for cigars and the like is not an affront

5

to the followers or adherents of said sect and does not, in any way, tend to disparage their religious or moral beliefs." Further, in In re Hines, 31 USPQ2d 1685, 1687 (TTAB 1994), the Board noted that older reported cases involving Section 2(a) refusals, although they were made on the Section 2(a) ground of being scandalous, concerned a perceived offense to religious sensibilities.[4]

With the Federal Circuit's decision in In re Mavety Media Group, 33 F.3d 1367, 1371, 31 USPQ2d 1923, 1925 (Fed. Cir. 1994), it has become clear that the proper ground for refusing marks which would offend the sensibilities of an ethnic or religious group is that the matter is disparaging to the members of that group, rather than that the matter is offensive or scandalous. In Mavety, the Federal Circuit held a mark may be found scandalous only if it is offensive to a substantial composite of the general public. However, because many ethnic and religious groups constitute small minorities of the entire U.S. population, marks that are offensive only to members of such groups could never be refused under the "scandalous" ground of refusal under

---

[4] On reconsideration of the Hines decision, 32 USPQ2d 1376 (TTAB 1994),the Board did not retreat from its distinction between cases involving offense to the public at large and those involving offense to particular religious sensibilities, although it found the evidence supporting the refusal was lacking and therefore resolved its doubt in favor of publishing the mark for opposition.

Section 2(a).  The focus of the Board in <u>Reemtsma</u>,

<u>Waughtel</u>, the <u>Hines</u> affirmance, and other cases, on whether

the application of a mark to a product would tend to

disparage the beliefs of the followers of a particular

religion, is an explicit acknowledgement that the proper

focus, when religious beliefs or tenets are involved, is on

the group of persons that adhere to those beliefs or

tenets.  As a leading commentator has put it:

> [The disparagement bar] differs from
> the scandalousness provision, foremost
> because there is a particular object of
> disparagement, i.e., a person, group,
> set of beliefs, institution or symbol,
> and the statutory bar depends on the
> perspective of the object of
> disparagement.  In contrast, the
> scandalousness provision protects the
> public as a whole and the effect of the
> trademark is judged from the
> perspective of the general public.

1 Jerome Gilson et al., Trademark Protection and Practice

§3.04[6][a][i][B], at 3-122 (December 2003).

The <u>Mavety</u> decision did not purport to extend the

Section 2(a) scandalousness analysis to cases involving

religious or ethnic sensibilities.[5]  Thus, whatever

---

[5]  The discussion of <u>Mavety</u> in the reconsideration of the <u>Hines</u>
decision related only to the sufficiency of the evidence and the
Board's recognition that <u>Mavety</u> dictates that if there is doubt
about the sufficiency of the evidence to support a Section 2(a)
refusal, then that doubt is to be resolved in favor of the
applicant.  Nothing in the Board's grant of reconsideration
signals that it was adopting scandalousness, and the <u>Mavety</u> focus
on reaction of the general public, as the appropriate refusal

inconsistency or uncertainty may have resulted from

Riverbank Canning and subsequent Board decisions, the

ground for a refusal involving a perceived offense to

religious or ethnic sensibilities is now clearly the ground

of disparagement.[6]

The determination whether a proposed mark is

disparaging requires application of the following two-part

test:

> 1) what is the likely meaning of the
> matter in question, taking into account
> not only dictionary definitions, but
> also the relationship of the matter to
> the other elements in the mark, the
> nature of the goods or services, and
> the manner in which the mark is used in
> the marketplace in connection with the
> goods or services; and
>
> 2) if that meaning is found to refer to
> identifiable persons, institutions,
> beliefs or national symbols, whether
> that meaning may be disparaging to a
> substantial composite of the referenced
> group.

---

when religious or ethnic sensibilities are involved.  The
statements in the original affirmance differentiating the two
refusals remain good law.
[6] We acknowledge that there may be cases in which even
individuals outside the disparaged group would also find use of a
term for a particular product offensive.  Therefore, there could
be circumstances in which the use of a particular term could be
found both disparaging to some and scandalous or immoral to the
public at large.  For example, there may be non-Muslims who would
find use of KHORAN for wine offensive.  We do not reach that
question, however, as we have no evidence bearing on the point,
and our decision is limited to the ground of disparagement.

In re Heeb Media LLC, 89 USPQ2d 1071, 1074 (TTAB 2008); In re Squaw Valley Development Co., 80 USPQ2d 1264, 1267 (TTAB 2006); Harjo v. Pro-Football, Inc., 50 USPQ2d 1705, 1740-41 (TTAB 1999), rev'd on other grounds, 284 F.Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003), remanded, 415 F.3d 44, 75 USPQ2d 1525 (D.C. Cir. 2005), on remand, 567 F.Supp.2d 46, 87 USPQ2d 1891 (D.D.C. 2008), aff'd 565 F.3d 880, 90 USPQ2d 1593 (DC Cir. 2009).

There is no real dispute that the Office has met the burden of proving the second part of the test. Specifically, the examining attorney has submitted a significant amount of evidence showing that the Koran is "the sacred text of Islam, considered by Muslims to contain the revelations of God to Muhammad,"[7] and that Islamic authorities view alcohol as a prohibited substance. Applicant does not dispute that this is the case. Applicant's only argument, with respect to this prong of the test, is that "whether the mark comprises of [sic] disparaging matter is to be ascertained from the standpoint of not necessarily a majority, but a substantial composite of the general public."  Brief, p. 6.  However, the test quoted by applicant, for which it cites In re Mavety Media

---

[7]  The American Heritage Dictionary of the English Language, 4th ed. © 2000.

Group, 33 F.3d at 1371, 31 USPQ2d at 1925 (and which case, in turn, cites In re McGinley, 660 F.2d at 485, 211 USPQ at 673 (CCPA 1981)), refers to the determination of whether a mark is scandalous, not disparaging. As previously discussed, whether a proposed mark is disparaging must be determined from the standpoint of a substantial composite of the referenced group. In re Heeb Media LLC, 89 USPQ2d at 1074.

The evidence submitted by the examining attorney in the case at hand, which shows that drinking alcohol is considered unacceptable by Muslims, is sufficient to show that the use of the name of the sacred text of Islam for a substance prohibited by that religion, indeed, a substance prohibited by that very text, would be disparaging to followers of Islam and their beliefs.[8]

It is in connection with the first prong of the test, i.e., the likely meaning of the matter in question, that the real disagreement exists between applicant and the examining attorney, and between the majority and the

---

[8] For this reason, we disagree with the suggestion by the dissent that the ground of disparagement is appropriate only if the mark per se is disparaging, without regard to the goods or services in connection with which the mark is used. It is clear that when a product whose use is forbidden among members of a particular group face use of a term integral to their beliefs or tenets as a mark for the forbidden product, the absence of offense attributable to the term per se does not mitigate the substantial offense among the group whose belief or tenet is disparaged by the particular use. See Reemtsma, supra.

dissent. The examining attorney, as noted, takes the position that applicant's mark, KHORAN, is the phonetic equivalent of Koran, while applicant asserts that it is a different word, namely, an Armenian term with the English translation of "altar."

The evidence of record shows that the word "Koran" comes from Arabic. As a transliterated word, the spelling in English varies. One article states that "Quran is spelled as Qur'aan, Koran and commonly as Quran." www.articlesbase.com. The American Heritage Dictionary, supra, lists "Qur'an" as a variant form, and states that the text is also called "Alcoran." The examining attorney has made of record numerous submissions in which the Koran is referred to by variant spellings. Among these submissions are several personal postings, in the form of comments or blogs, as well as web articles, in which Koran is spelled "Khoran." See, for example:

> There is no true alliance with the Islamic governments because the Khoran forbids it. …Read this book and you will be compelled to also read parts of the Khoran to see why our government's policies are leading us into a terrible trap.
> Publisher's notes on book Princes of Islam, website headed "Welcome to C.T.U. Bookstore," (Conservative Theological University), http://97.66.25.67/bookstore/store.php

11

It is forbidden for muslims [sic] to hurt or kill anyone, according to the Khoran. http://messageboard.rediff.com, (letter posted on a message board)

He says the surgeons are fine, but the nurses and those involved in aftercare view painkillers like they do drugs or alcohol—against the laws of the Khoran. Live Journal, http://zainybrain.livejournal.com (journal entry by Wendy Wheeler about her dinner with "Jungle Bob")

In Prager's view, allowing Ellison to be sworn in on the Khoran "will embolden Islamic extremists and make new ones…." "Will Samson, On a Journey of Discovery Toward God, Society and Sustainability," Nov. 28, 2008, http://willzhead.typepad.com

I cringe [sic] anytime I found a Holy Bible in the drawer of my hotel rooms. Why not the Khoran, the Taoism of Buddha, the Torah? Comment by gingersoul, Dec. 11, 2006 on article "Religion finds firm footing in some offices," SoulCast, http://soulcast.com

But this points much more at the human aspect of interpreting what is in the Khoran. Post by Sparky on FaithFreedom.org website

We do not suggest that these uses by individuals show that "Khoran" is an accepted spelling of "Koran."  However, the fact that there are recognized variations in the transliterated spelling of this word, and that some people

12

believe that "Khoran" is an accepted spelling, show that people viewing the mark KHORAN are likely to understand it as a variation or misspelling of "Koran." See In re Carlson, 91 USPQ2d 1198, 1201 (TTAB 2009) ("We do not mean to suggest that listings in blogs or even a slang dictionary show that 'houzing' is an accepted alternate spelling of 'housing' or that this spelling is in common and widespread use. But these uses indicate either that 'housing' may be misspelled as 'houzing' or that the writers who deliberately use this spelling view 'houzing' as a misspelling or alternate spelling that readers will immediately understand as 'housing.'").

A mere misspelling of a word does not serve to avoid a finding that it is disparaging. In In re Hines, supra, the Board did not even discuss the fact that the mark BUDDA BEACHWEAR and design was a misspelling of Buddha; there was no suggestion that the misspelling of Buddha avoided the finding that the mark referred to Buddha. See also, In re Carlson, 91 USPQ2d at 1200, and cases cited therein ("In general, a mere misspelling of a word is not sufficient to change a merely descriptive term into an inherently distinctive trademark"). The question is whether KHORAN would be perceived as the word Koran, or whether it would be understood as a totally different word, i.e., the

13

Armenian word for "altar"[9] or, as the dissent suggests, a term of unknown meaning.

We find that KHORAN gives the commercial impression that it is the word Koran, and that the public (other than Armenian speakers) in general, and Muslim Americans in particular, would regard the mark as referring to the holy text of Islam. First, KHORAN can be pronounced identically to the word "Koran." Although we note applicant's argument that the letter "H" in its mark is not silent, but has a distinct sound in combination with the letter "K", it has long been held that there is no correct pronunciation of a trademark that is not a recognized English word. Whether or not KHORAN may be pronounced by an Armenian speaker as applicant asserts, many Americans, including Muslim Americans, would pronounce it as "Koran." This pronunciation would be particularly troubling if KHORAN wine were advertised on the radio, where consumers would not even be aware that applicant's mark contains an "H." Second, because "Koran" has various accepted spellings, people are likely to regard KHORAN as another variant spelling, even if not an "official" one. Third, there is

---

[9] No refusal was raised as to whether, if KHORAN were viewed as "altar," the mark would be generic, merely descriptive, deceptively misdescriptive or deceptive as indicating sacramental wine; therefore, these issues are not before us.

14

evidence that people do use "Khoran" as a spelling for "Koran." Fourth, there is no evidence that people other than those who speak and understand Armenian are likely to recognize "Khoran" as the Armenian word for "altar." In particular, there is no evidence that Muslim Americans would be aware of the Armenian meaning of the word.

In determining the first prong of the disparagement test, the dissent states that one must look to the meaning of applicant's mark from the standpoint of the general public, rather than that of Muslim Americans. For the reasons discussed above, in this case whether we consider how the mark would be perceived by Muslim Americans or the public in general, the result would be the same. However, we cannot agree with the dissent that we must consider the mark only from the standpoint of the public at large. We can envision situations in which, for example, a term or symbol would be clearly understood by members of a religious group as being significant in their worship, but would not be known or understood by the public at large. We cannot conclude that the prohibition against registration of disparaging marks would ignore such situations. The Reemtsma case is an example of this; it is unlikely that, at the time registration for the mark

15

SENUSSI was sought, the public in general was aware that Senussi was the name of a Muslim sect.

This is not to say that a term that otherwise might be considered disparaging could not also have such a well-known alternative meaning that, as used in connection with particular goods or services, that alternative meaning would be found to be the applicable one.  For example, in In re Over Our Heads Inc., 16 USPQ2d 1653 (TTAB 1990), the Board found that the mark MOONIES and design (with naked buttocks substituted for the letters "O") used for a doll that moons would be perceived as indicating that the doll moons, rather than as a reference to members of The Unification Church.  Here, however, the Armenian meaning of KHORAN would not be known to the vast majority of Americans and, as discussed, they would view KHORAN as the equivalent of Koran.

Citing In re Heeb Media, LLC, the dissent notes that KHORAN should not be considered in the abstract but in connection with the goods.  We agree, and have not reached our conclusion based on an analysis of the mark in the abstract.  However, we cannot limit our consideration of the mark to prospective purchasers of wine.  Because wine is a consumer product and is sold to the general public in retail establishments stocking many types of products, and

16

because the identification of goods in the application includes no limitations as to channels of trade in which the goods are sold or advertised, we must assume that Muslim Americans would be exposed to the sale and advertising of the product even if they do not actually buy or consume wine. We note, in regard to this point regarding exposure to the products, the article in "Capitalism Magazine," www.capmag.com, which explained the affront perceived by Muslim-American taxi drivers servicing the Minneapolis airport who were not purchasers of alcohol but were faced with passengers who possessed visible packages of duty free alcohol.

The dissent has noted that the first examining attorney "did not assert a refusal to register under Section 2(a)," and that this examining attorney accepted the meaning of the mark put forth by applicant. As noted in footnote 1, the first two Office actions were by one examining attorney, with the first action requiring that the mark be translated as "altar" and the second action being an examiner's amendment reflecting applicant's compliance with that requirement. In any event, the fact that one examining attorney was either not aware that KHORAN could be perceived as KORAN, or was influenced by

17

the words "Armenian Wine" that appear prominently on the wine bottle specimen label, is essentially irrelevant.

If applicant were to obtain a registration for its mark it would not be limited to use of the mark in conjunction with this trade dress, or in conjunction with the words "Armenian Wine," or to any particular rendition now in use. Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); see also Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a). Further, applicant could use the mark with any type of wine, and would not have to identify its goods as being Armenian wine. Thus, it cannot be assumed that, because they would have additional information from applicant's trade dress, consumers would understand the mark as an Armenian word, rather than as the equivalent of "Koran." And, as discussed above, the wine could be advertised on the radio, where there would be no visual cues that the mark is meant to be an Armenian word.

The dissent also contends that the public would not view KHORAN as the word "Koran" **because** the Koran prohibits the use of alcohol. However, this argument actually supports the position that KHORAN would be perceived as Koran because it presupposes that those seeing KHORAN on a bottle of wine will recognize it as the phonetic equivalent of "Koran." It is only after such recognition that,

18

according to the dissent, consumers would reason that KHORAN could not be a reference to the "Koran" because of that text's prohibition against the use of alcohol. Moreover, this argument by the dissent seems to be the equivalent of saying that because the term is so disparaging to Muslims and their beliefs, no one would believe that the term could reference the Koran. While some people might not believe that a producer of wine would choose to use the name of the holy text of Islam in a disparaging manner, they still would understand KHORAN as "Koran." For the reasons we have already discussed, including that KHORAN and "Koran" can be pronounced identically, and that there are variations in how "Koran" is spelled, the public is likely to view KHORAN as "Koran," even though they consider it to be a disparaging use.

As for the dissent's comment that there is no apparent intent by applicant to disparage Muslims or Islam, such intent is not necessary in order to find that the mark does, in fact, disparage them or their beliefs. See In re Heeb Media LLC, 89 USPQ2d at 1077: "The fact that applicant has good intentions with its use of the term does

19

not obviate the fact that a substantial composite of the referenced group find the term objectionable."[10]

Accordingly, we conclude that Muslims would find the mark KHORAN used for wine as disparaging to themselves, their religion and their beliefs.

We have considered applicant's arguments based on the fact that, on reconsideration, the Board in In re Hines reversed the refusal of registration of BUDDA BEACHWEAR and the design of a Buddha and vacated its earlier decision affirming such refusal(see discussion at footnotes 4 and 5). The Board did so in that case because there was no evidence in the record that Buddhists would find the mark disparaging, and in light of the Federal Circuit's decision in the Mavety case, the Board's concern was to avoid interposing its own judgment for that of Buddhists. This was sufficient to raise doubt as to whether the mark was disparaging, and in accordance with Board policy, the Board resolved that doubt in favor of publication of the mark for opposition.

---

[10] Although the dissent would treat the lack of an overt intent to disparage as a factor to be considered in the analysis of the refusal, we note that, in general, lack of a bad intent, or put another way, innocent adoption, does not avoid a refusal of registration. For example, lack of an intent to cause confusion does not avoid a refusal of registration under Section 2(d) of the Act.

In the present case, however, we have a very different situation. The record is replete with evidence that alcohol, including wine, is prohibited by the tenets of Islam. Therefore, the Board is not in a position in which it is interposing its own judgment for that of Muslims. Because we have no doubt both that KHORAN would be recognized as the name of the holy text of Islam, and that the use of this term for wine would be disparaging to the religion and beliefs of Muslim Americans, the Mavety principle of resolving doubt in favor of publication does not come into play. In re MBNA Am. Bank, 340 F.3d 1328, 67 USPQ2d 1778 (Fed. Cir. 2003)

Decision: The refusal of registration is affirmed.

Mermelstein and Wellington, Administrative Trademark Judges, dissenting:

We respectfully dissent from the decision of the majority that the examining attorney has sustained the burden of demonstrating that the mark KHORAN, used for wine, is disparaging to Muslims. In particular, we believe the majority has misapplied the disparagement test and we disagree with their determination as to what is the likely meaning of KHORAN.

At the outset, we note that the Board has acknowledged previously that decisions as to whether a mark is

scandalous or disparaging can be difficult ones and, at

least with respect to *ex parte* cases, it is preferable to

resolve doubts in favor of the applicant:

> [T]he guidelines for determining whether a mark is
> scandalous or disparaging are 'somewhat vague' and the
> 'determination [of whether] a mark is scandalous [or
> disparaging] is necessarily a highly subjective one.'
> *In re Hershey*, 6 USPQ2d 1470, 1471 (TTAB 1988).
> Because the guidelines are somewhat vague and because
> the determination is so highly subjective, we are
> inclined to resolve doubts on the issue of whether a
> mark is scandalous or disparaging in favor of
> applicant and pass the mark for publication with the
> knowledge that if a group does find the mark to be
> scandalous or disparaging, an opposition proceeding
> can be brought and a more complete record can be
> established....

*In re Over Our Heads Inc.*, 16 USPQ2d 1653 (TTAB 1990)(Board

resolved doubt regarding the scandalous nature of the mark

MOONIES in favor of publication). In *In re Mavety Media*

*Group Ltd.*, 33 F.3d 1367, 1374, 31 USPQ2d 1923, 1928 (Fed.

Cir. 1994), the Court of Appeals for the Federal Circuit,

our primary reviewing court, expressly approved of the

Board's approach in *In re Over Our Heads Inc.* to resolve

doubt in applicant's favor with the knowledge that any

person who believes he would be damaged by registration of

the mark may bring an opposition or cancellation

proceeding. We have significant doubt in this case as to

whether, based on the current record, applicant's mark is

disparaging of Muslims and we think the better course is to allow the mark to be published for opposition.

The majority has properly set forth the two prongs of the disparagement test; however, we strongly disagree with the majority's application of the first prong of the test. Specifically, we dispute the majority's contention that the determination of "what is the likely meaning of the matter in question" should be made from the perspective of the disparaged group. Rather, we believe the Board must look to the general population of the United States and how they will understand applicant's mark when it is being used in connection with the identified goods or services, in this case wine. It is only after we determine the likely meaning of applicant's mark that we consider the second prong which is from the standpoint of the purported disparaged group, i.e., "whether that meaning may be disparaging to a substantial composite of the referenced group." In its decision, the majority appears to have conflated the two prongs and made both determinations from the standpoint of the purported disparaged group, in this case Muslims. We believe this approach is incorrect inasmuch as the test, as enunciated by the majority itself and used by the Board for many years, does not support such an interpretation. Moreover, by considering only the

23

purported disparaged group in determining the likely meaning of a mark would essentially be "loading the deck" for purposes of any disparagement test and will lead to cases where a proposed mark will be found disparaging despite the fact that most Americans attribute a different and inoffensive meaning to that mark.

The majority's interpretation is also a significant departure from our application of the disparagement test. We are unaware of any other cases where the Board has limited the analysis of the likely meaning of a mark by deciding how only the alleged disparaged group would understand the mark. To the contrary, our determination of the likely meaning of an applicant's mark appears to have always been from the standpoint of the general public encountering the mark in connection with the identified goods or services. For example, in *In re Over Our Heads Inc.*, 16 USPQ2d 1653 (TTAB 1990) (involving the mark MOONIES, with the two "O" letters forming a caricature of a naked buttocks), the Board noted that the term "Moonie(s)" is a reference to a member of The Unification Church, but also took into consideration several other possible meanings of the term, including the act of exposing one's buttocks. Ultimately, the Board decided "[w]e believe that applicant's mark MOONIES – with its naked buttocks design

24

and spelled without emphasizing the letter "m" – would, when used on a doll, most likely be perceived as indicating that the doll "moons," and would not be perceived as referencing members of The Unification Church." 16 USPQ2d at 1654. Noticeably absent in this decision is any consideration of how members of the alleged disparaged group themselves would perceive the mark. Clearly, had the Board considered the likely meaning of the mark only from the standpoint of members of The Unification Church, the outcome in that case would likely have been different.

In addition to our dispute with the majority's application of the first prong of the disparagement test, we further disagree with the majority because we believe that most persons encountering applicant's mark on wine will not attribute any specific meaning to the mark. Rather, we find it more likely that the general public will perceive the mark as designating the source of the goods, rather than see the mark as a misspelling of the word "Koran."

We have considered all of the evidence submitted during prosecution of the application, including the submissions showing the Koran being referred to by different spellings. Among these are several references in comments or blogs, in which Koran is spelled "Khoran." At

25

the same time, we note that the spelling "Khoran" is not identified in any of the dictionary evidence of record as one of the usual or accepted spellings for Koran. Rather, the evidence merely indicates that "Khoran" has been used by several persons, possibly as a misspelling of Koran. And, as to the examining attorney's argument that applicant's mark is the phonetic equivalent of "Koran," we have often stated that there is no correct pronunciation of a trademark when the term is not a recognizable English word. See *In re Belgrade Shoe*, 411 F.2d 1352, 162 USPQ 227 (CCPA 1969) and *Interlego AG v. Abrams/Gentile Entm't Inc.*, 63 USPQ2d 1862 (TTAB 2002). Here, applicant's mark begins with the uncommon consonant combination "Kh," which may increase any possible confusion as to the pronunciation. Nevertheless, it is quite reasonable to assume that applicant's mark will, at least for some, be pronounced the same as or similar to "Koran."

Also of relevance, there is evidence of record supporting applicant's contention that the term "Khoran" means "altar" in Armenian.[11] This evidence includes:

---

[11] The evidence was actually submitted by the initial examining attorney who did not assert a refusal to register under Section 2(a), but merely required applicant to submit the following translation of the mark, "The English translation of the word KHORAN in the mark is ALTAR." We note that the examining attorney further required applicant to furnish "advertisements or promotional materials for the goods"; information regarding

> The Armenian Orthodox Church publishes
> its official periodical, KHORAN
> (Altar), in Armenian, Greek and
> English.
> www.armenianprelacy.com
>
> The Armenian Church...A Badark
> Glossary...
> Khoran ----Altar
> www.armenianchurch.net
>
> The Armenian word for the altar is
> Khoran, which means the tent or
> tabernacle where the Ark of the
> Covenant was placed, symbolizing the
> presence of God...
> www.hyeetch.nareg.com

Again, in making the determination as to the likely meaning of applicant's mark, we believe the Board should consider how the general public, not just the alleged disparaged group, will perceive the mark. Furthermore, the likely meaning of the mark is not considered in a vacuum, but in the context of the identified goods, in this case, wine, as well as the way the mark is used in the marketplace. See *Heeb Media LLC*, 89 USPQ2d at 1074 (the "likely meaning" of an applicant's mark is determined by "taking into account the nature of the goods and services and the manner in which it is used in the marketplace"). In this regard, the only real evidence of the mark being used in connection with wine is applicant's specimen of

whether the mark "has any significance in the alcoholic beverages trade or industry" or whether the mark "has any geographical significance, or any meaning in a foreign language...."

use.  Although applicant's particular method of use of its mark is only relevant to the extent that it shows one of many possible uses of the mark on or in connection with wine, we note that there is nothing in the way applicant uses its mark (as show in the specimen of use) which would suggest any connection to Islam or its holy text.

There is no dispute that Islamic authorities view alcoholic beverages, such as wine, as prohibited based on the Koran and the record is replete with evidence establishing this.  To the extent that the mark should be considered in the wine marketplace, we find this prohibition on alcoholic beverages as a factor that may decrease the likelihood that anyone from the general public, at least those familiar with the prohibition, would understand applicant's mark as a reference to the Koran. It would be counterintuitive for such persons to associate applicant's mark with the holy text prohibiting the goods being sold under the mark.[12]  We must also bear in mind that

_____

[12] The majority misconstrues such reasoning as the "equivalent of saying that because the term is so disparaging to Muslims and their beliefs, no one would believe that the term could reference the Koran."  We are well aware that the crux of the examining attorney's argument is that *because* applicant's mark is being used on wine and that alcoholic beverages are forbidden by the Koran, Muslims will perceive the mark as disparaging. Nevertheless, and for sake of clarity, we point out that our determination as to the likely meaning of applicant's mark is not made under the premise that the term "Koran" is a disparaging term; indeed, to operate under such a premise would be premature

28

the evidence showing the spelling "Khoran" to identify the Koran, was in the context of religion.  Thus, that evidence was presumably limited to those who are more likely predisposed to perceiving that term as a reference to the Koran.  Put differently, the examining attorney's evidence shows "Khoran" being used by a few individuals to reference the Koran, but it is unclear how well-recognized this spelling would be out of the context of religion because it is not a widely-accepted spelling for the Islamic holy text.

Considering the evidence of record, we believe that when applicant's KHORAN mark is heard or seen in connection with wine, it is more likely that the general public will not attach any particular meaning to the mark. Accordingly, we do not believe that the first part of the disparagement test has been satisfied by the Office and we would reverse the refusal of registration  on that basis.

---

and unfair to applicant because we would be starting our analysis by *assuming* that a term which is similar to applicant's mark is disparaging, rather than reach that conclusion as a result of our analysis.  Moreover, as we note, there is no evidence in the record showing the term "Koran" has ever been used by anyone in a disparaging manner in connection with wine or otherwise.  Thus, when considering how applicant's mark will be understood when used on wine, we merely find that that those who are familiar with the Islamic prohibition on alcoholic beverages may be less likely to associate applicant's mark with the holy scriptures of Islam.

Inasmuch as we would find that the office has not satisfied the first prong of the disparagement test, we see no need to discuss the second part of the test, namely, if the meaning of applicant's mark is also a reference to Muslims and, if so, would it be considered disparaging to a substantial composite of Muslims. We would be remiss if we did not further point out that this case essentially involves an applicant seeking to register a mark that has a plausible and innocuous meaning, as provided by applicant and accepted by the first examining attorney, i.e., the mark is the transliteration of the Armenian term for "altar." However, registration is being refused because the Office believes that the mark is likely to be understood as a misspelling of "Koran," which is also a transliteration and, when used on wine, the mark is disparaging to Muslims. There is no dispute that the term "Koran", by itself and as defined, has no disparaging meaning or connotation. Moreover, there is absolutely no evidence in the record showing that applicant or anyone else has ever used the term "Koran" in a disparaging manner in connection with wine (or otherwise).[13] This case is

---

[13] While we are keenly aware that any resulting registration will not prevent applicant from changing its advertising or trade dress, we are satisfied on this record that there is no readily apparent intention to disparage Muslims or Islam resulting from the method of display of KHORAN by applicant, nor is there any

somewhat novel because the Office contends that applicant's mark takes on a *disparaging* connotation when used in connection with wine. This is unlike other disparagement cases where, at the very least, the marks themselves arguably conveyed a negative connotation and were therefore considered to be disparaging. And, in previous cases with very similar factual scenarios to the matter before us, the asserted refusal was based under Section 2(a)'s prohibition against marks containing "scandalous matter," rather than the separate and distinct prohibition against "disparaging" marks.[14] This is not a distinction without a difference

---

overt connection or reference to Islam or the Koran. And, while the lack of an overt intention to disparage is admittedly not dispositive, we nonetheless believe it a factor to be considered in determining the likely impression of the mark.

[14] A review of prior Section 2(a) decisions reveals that those cases with facts most analogous to the matter before us involved the "scandalous matter" ground for refusal rather than "disparagement"; in particular, we looked at several cases that dealt with marks with religious terms that by themselves were not objectionable, but were refused registration based on a perceived offense to religious sensibilities due to the nature of the identified goods. See, *e.g.*, *In re Riverbank Canning Co.*, 95 F.2d 327, 37 USPQ 268, 270 (CCPA 1938)(MADONNA for wine held "scandalous"); *In re Reemtsma Cigarettenfabriken G.m.b.H.*, 122 USPQ 339 (TTAB 1959)(SENUSSI for cigarettes held "scandalous" ("Senussi" being the name of a Muslim sect whose adherents are forbidden the use of cigarettes)); and *In re Sociedade Agricola E. Comerical Dos Vinhos Messias, S.A.R.L.*, 159 USPQ 275 (TTAB 1968)(MESSIAS for wine and brandy held scandalous). This line of cases may be distinguished from other cases, such as our decision in *In re Hines* where it was the mark itself that was essentially at issue. *In re Hines*, 31 USPQ2d 1685 (TTAB 1994), *opinion vacated on reconsideration*, 32 USPQ USPQ2d 1376 (TTAB 1994). In that initial decision (since vacated for other reasons), we affirmed the disparagement refusal essentially because the mark's "depiction of the religious founder [Buddha] in tree-emblazoned

because, as the majority points out, the tests for determination are clearly different, including whether the mark is scandalous based on the perceptions of a substantial composite of the *general population* or whether the mark is disparaging to a substantial composite of the *referenced group*. Compare, e.g., *Mavety*, 31 USPQ2d at 1926 (scandalous), with *In re Squaw Valley Dev. Co.*, 80 USPQ2d 1264, 1267 (TTAB 2006) (disparaging).

In any event, we believe that there is significant doubt as to whether or not the general public is even likely to equate applicant's mark, when considered in the context of wine, with the Islamic holy text. We would rather choose to resolve this doubt by allowing the mark to be published for opposition, bearing in mind that any decision in an *ex parte* appeal is without prejudice to any opposition or cancellation which may be filed where the

---

casual wear, strictly for commercial purposes, is disparaging."
*Id.* at 1688. We are not saying a rule has been established that
dictates when either a "scandalous" or "disparaging" refusal is
appropriate, but merely pointing out that what appear to be the
most analogous cases, while older, they involved a scandalous
refusal.
    The majority, on the other hand, discusses many of the same
cases and comes to the conclusion that "the ground for refusal
involving a perceived offense to religious or ethnic
sensibilities is now clearly the ground of disparagement." We
remain unconvinced that the case law leads to such a rule or that
a rule is even necessary.

parties will have an opportunity to fully develop an evidentiary record and argue the issue.